## KINSEY *v.* UNION TRACTION COMPANY ET AL.

[No. 20,471. Filed June 26, 1907. Rehearing denied January 8, 1908.]

1. DAMAGES.—*Real Property.*—*Sales.*—The sale of the damaged real property does not cut off the owner's right of damages which accrued to him prior to such sale. pp. 575, 620.

2. INTERURBAN RAILROADS.—*Additional Servitude.*—*Streets.*—The operation of an interurban railroad, within a city, over the tracks of a street railroad company, does not constitute an additional servitude to the lands used for street purposes. Jordan, J., and Montgomery, J., dissenting. pp. 601, 602, 622, 634.

3. SAME.—*Operation of.*—*Negligence.*—*Special Damages.*—The negligent operation, within the city streets, of interurban cars of excessive weight, size or number, causing damage to the property of abutters, constitutes a cause of action. pp. 601, 621, 634.

From Superior Court of Marion County (65,668); *Vinson Carter*, Judge.

Suit by Lottie A. Kinsey against the Union Traction Company and others. From a decree for defendants, plaintiff appeals. *Reversed.*

*Gavin & Davis*, for appellant.

*F. Winter, W. H. Latta, J. A. Van Osdol* and *F. E. Matson*, for appellees.

JORDAN, J.—Appellant, as plaintiff below, on July 28, 1903, commenced this action against appellees, the Union

Traction Company, the Indiana Traction Company, the Indianapolis Northern Traction Company, the Indianapolis Traction & Terminal Company and the Indianapolis Street Railway Company. These parties demurred separately and severally to the complaint on the ground of insufficiency of facts. The court sustained the demurrers, to each of which rulings appellant excepted, and declining to plead further, judgment was accordingly rendered against her. She appeals, and relies for reversal upon the alleged erroneous rulings of the court in sustaining the demurrers in question. By her complaint she alleges that she is, and for five years last past has been, the owner in fee simple of the following described real estate, to wit: Lots fifty-five and fifty-six in Ovid Butler's addition to College Corner, all of which real estate is situated in the city of Indianapolis, Marion county, Indiana; that this real estate, for a distance of seventy feet, fronts and abuts, at the corner of Fifteenth street, upon College avenue, a public street in said city, and runs thence west one hundred sixty feet to an alley; that plaintiff owns, as a part of her said real estate, the fee simple of the ground in front of her premises extending to the center of said College avenue; that for the past five years plaintiff has had upon the front part of her lot, and within sixty feet of the center of said avenue, a frame house consisting of fifteen rooms, constructed and used by her and her family as a dwelling during all of said time, her family so occupying the same consisting of herself and husband, with their children and small grandchildren; that "on April 7, 1898, the defendant Indianapolis Street Railway Company was organized as a street railway corporation, under the laws of the State of Indiana, for the purpose of owning and operating a street railway in the city of Indianapolis; that in said year it obtained a franchise for thirty years, and entered into a contract with the city of Indianapolis, for the construction of said railway, and the carriage of passengers thereon over the streets of said city, including said College

avenue; that in pursuance thereof, it entered upon and has since owned and operated, until the transfer of its said system to the defendant Indianapolis Traction & Terminal Company, a double track, electric, street railway over and upon said avenue, one track being laid upon each side of the center thereof, together with a system of iron . poles, with crosspieces and wires strung thereon, placed at one side of said avenue; that, by the terms of its said franchise and contract, said Indianapolis Street Railway Company was forbidden to haul freight over its said lines in said city, and was required to permit the use of said lines and tracks by any incorporated interurban railroad company, upon the consent of the city thereto; that subsequently, upon August 4, 1902, the defendant Indianapolis Traction & Terminal Company, a corporation organized under the laws of the State of Indiana, received from said city a similar franchise, and entered into a similar contract; that upon said last-named date the defendant Indianapolis Northern Traction Company, claiming to be a corporation organized under the laws of the State of Indiana, obtained from said city a franchise and entered into a contract, by which it was permitted for thirty years to run its interurban cars over the railroad track of said Indianapolis Street Railway Company, including the track on said College avenue, along and in front of plaintiff's said real estate, with the right to run passenger-, baggage-, express- and freight-cars thereon, for the carriage of passengers, baggage and freight; that upon said date said Indianapolis Northern Traction Company entered into a contract with said Indianapolis Street Railway Company, whereby said Indianapolis Street Railway Company agreed that said Indianapolis Northern Traction Company should have the right to run its said passenger- and freight-cars over its track in said College avenue and other streets of said city of Indianapolis, to the terminal station in the center of the business district of said city; that upon August 4, 1902, said defendant Union

Traction Company, claiming to be a corporation organized under the laws of the State of Indiana, obtained from said city a franchise and entered into contracts with said city and said Indianapolis Street Railway Company, similar to those of said Indianapolis Northern Traction Company; that at the time of entering into such contracts, said Union Traction Company was the owner of, and engaged in operating, an electric railway for the carriage of freight and passengers from the city of Marion, through the cities of Alexandria and Anderson, and through many other cities and towns, a distance of eighty miles, to the city of Indianapolis, and from the city of Elwood, through the cities of Alexandria and Anderson, a distance of seventy miles, to the city of Indianapolis, and from the city of Muncie, through the city of Anderson, a distance of sixty miles, to said city of Indianapolis; that the track and right of way of said Union Traction Company extended only to the corporation line of said city of Indianapolis, and its cars then, under and pursuant to said contracts, ran upon and over the tracks of said Indianapolis Street Railway Company, entering College avenue at Fall creek, about Thirtieth street, and running over said avenue a distance of about two miles, and then over other streets about two miles, to the terminal station, in the center of said city.

It is further alleged that the track of said Union Traction Company is laid with heavy "T" rails, weighing from seventy to ninety pounds per yard, the same being fully as heavy as the rails of the ordinary steam railroad, and of the same pattern and shape; that the tracks on College avenue, are of the same kind and size, and the rails thereof were especially laid of this kind and weight in order that the large cars of said interurban companies might be run thereon; that the cars of said Union Traction Company and its successors are, and ever since its operation have been, about sixty feet in length, weigh about sixty-four thousand pounds, and are placed upon

heavy trucks, to which eight heavy iron or steel wheels are attached; that said cars have a seating capacity of sixty passengers, and are as large as, and heavier than the ordinary railroad passenger-cars, and often carry from one hundred to one hundred fifty passengers; that the great majority of the passengers carried by said cars into the city of Indianapolis are persons who come from points outside of Marion county, and at least one-half of them are carried from points at least forty miles distant from said city of Indianapolis; that under the schedule which has been maintained by said Union Traction Company and its successors, up to this time, one regular passenger-car arrives at Indianapolis each hour from 6 o'clock a. m. to 12 o'clock p. m., and one passenger-car leaves said city each hour from 5 o'clock a. m. to 11 o'clock p. m.; that in addition thereto four other regular passenger-cars leave said city of Indianapolis and four regular passenger-cars arrive at said city over said road each day between 7 o'clock a. m. and 11 o'clock p. m.; that, in addition to this, extra and special passenger-cars are run over said road into and from said city of Indianapolis; that in addition thereto, said Union Traction Company and its successors run, and since said August 4, 1902, have continued to run, into and from said city of Indianapolis, upon each day, many cars devoted exclusively to the hauling of freight to and from points ten to eighty miles distant from said city, the greater portion of such freight being hauled to and from points distant forty miles or more from said city; that each of said cars is and has been run over said College avenue, along and in front of said property owned by plaintiff; that by the terms of said franchise and contracts with said city, there is no limitation upon the number of cars or trains, nor the size of the trains for freight or passengers, which may be run in said city by said traction companies or their successors; that at least eight of said scheduled cars of said Union Traction Company and its successors, running in and

out of said city of Indianapolis each day, make no stop to take on or let off passengers between the city of Indianapolis and the city of Muncie, except at Anderson; that said cars run over a part of College avenue, and over other streets in the most thickly populated parts of the city of Indianapolis, along all of which streets there is a house upon every forty-foot lot, and said cars, in the course of their passage from their entrance on College avenue to the terminal station, cross at least fifty intersecting streets, and said cars make but one stop between the starting point and the corporation line of such city to take on or let off passengers; that the other passenger-cars of said Union Traction Company or its successors, running into said city of Indianapolis, over said streets, do not stop within said city at the street crossings to receive local passengers desiring to be transported to other points within the limits of said city, although frequently requested to do so by persons standing on the farther street crossings, those being the proper crossings at which the street-cars are required to stop for passengers, and the crossings at which, under its franchise, said interurban cars are required to stop when they do stop within said city to receive or let off passengers; that said cars and trains of said Union Traction Company and its successors are and have been continuously run at a rate of speed varying outside of the city of Indianapolis from thirty to sixty miles per hour; that said cars have frequently run and still continue to run over fifty miles per hour; that in said city there is no limitation upon their speed under the terms of their said contracts and franchise, nor by any city ordinance, and said cars frequently run at from twenty to thirty miles per hour along said College avenue and in front of the property of said plaintiff; that the schedule time of running their passenger-cars from the terminal station in the city of Indianapolis to the terminal station at Anderson, a distance of forty miles, varies from one hour and twenty-five minutes to one hour and

forty minutes; that the schedule time of said cars from the terminal station in the city of Indianapolis to the terminal station at Muncie varies from two hours to two and one-half hours; that about one-third of the cars make the runs in the shorter time; that said cars ordinarily make the schedule time; that said passenger-cars of said Union Traction Company and its successors are and have been provided with baggage compartments, in which trunks and the ordinary baggage of travelers are carried, together with water-coolers and closets; that at this time, and as said road has thus far been run, it usually runs one passenger-car at a time, but frequently, when the travel is heavy and for excursions, trains consisting of three or more cars are run over said road and over said College avenue and other streets of said city of Indianapolis.''

It is further alleged that freight-trains consisting of three cars have been run by said traction company over said College avenue every day, at various times during the day; that said traction company charges a graduated scale of prices according to the distance traveled, except that in the city of Indianapolis, for such local passengers as may be able to obtain passage on its cars, a straight cash fare of five cents is charged, without any right of transfer; that said traction company and its successors do not operate a street railway in said city of Indianapolis and have never so operated; that its cars and railroad system are not intended to accommodate the local traffic within the city, but its road, system and cars are constructed for and intended to accommodate travelers to and from points beyond the city; that such road, as constructed and operated, is and always has been a commercial road; that the road outside of the city of Indianapolis is not built upon the highway, but is constructed upon a separate right of way purchased by the Union Traction Company, and runs for the greater part of its line parallel with and adjacent to the right of way of the Cleveland, Cincinnati, Chicago & St. Louis Railway

Company, which operates a steam railroad; that said railroad is operated as a direct and active competitor of said steam railroad, for the carriage of passengers and freight from the cities of Muncie, Marion, Alexandria and Anderson to the city of Indianapolis, and its cars now carry, and for the last twelve months have been carrying, at least one-half the travel between these points; that the Indianapolis Northern Traction Company was organized for the benefit of and by the managers of the Union Traction Company, for the purpose of constructing, owning and operating an electric railroad for the transportation of freight and passengers between the city of Indianapolis and the cities of Noblesville, Tipton, Elwood, Logansport, Kokomo and various intermediate towns and cities, reaching points one hundred miles distant from the city of Indianapolis; that its track has not yet been completed and its road is not yet in operation, but both the road and track are now in process of construction, and will be completed and in operation on or before January 1, 1904; that it is proposed to be made, and will be made in its construction, equipment and manner of operation, similar to that of the Union Traction Company and its successors, save and except that its cars will be heavier and capable of carrying more passengers and freight and of running at a higher rate of speed; that cars and trains to be run over its road will be run in the same manner, for the same purpose, with the same frequency, and with the same stops as said Union Traction Company's cars and trains have been and are now operated; that on September —, 1902, said Indianapolis Street Railway Company transferred to said Indianapolis Traction & Terminal Company all of its rights, franchises and systems of said railway and tracks, and since said time the Indianapolis Traction & Terminal Company has been in full possession and control thereof; that said company will, unless prevented by injunction, permit the proposed use of its tracks within said city by said Union Traction

Company and the Indianapolis Northern Traction Company, and their successors and assigns; that on June —, 1903, said Indianapolis Northern Traction Company and .said Union Traction Company entered into an agreement of consolidation, for the purpose of uniting both of said systems of railroad into one road, under the name of the Union Traction Company of Indiana, by the terms of which contract all rights and franchises of each of these companies were to be vested in the consolidated company; that there-.upon said consolidated Union Traction Company of Indiana took possession, control and management of the franchises, property and railway system of each of said companies, whether the same were constructed or in process of construction, and thenceforth continued in control and management thereof until July —, 1903, when all the rights, property, franchises and railroad systems of said consolidated companies were transferred and leased to the Indiana Union Traction Company, a company organized under the laws of the State of Indiana, on June 1, 1903, for the purpose of purchasing, leasing, constructing, owning and operating an electric railroad system extending from the city of Indianapolis into and through all the county seats in the State of Indiana except two; that it is the object and purpose of said Indiana Union Traction Company to own and operate such a railroad system from Indianapolis to and through all counties in Indiana north of Marion county; that it proposes and will connect the present Union Traction Company's constructed system and the Indianapolis Northern Traction Company's system, now under construction, with systems extending into each and all of said counties, and run the cars therefrom and carry passengers and freight into and out of the city of Indianapolis, over said College avenue and along and in front of plaintiff's property in said city, and thence along other streets to its terminal station therein, under and by virtue of said franchises and contracts held by said Indianapolis

Northern Traction Company and said Union Traction Company; that the Indiana Union Traction Company has already under construction different systems of roads extending from the city of Ft. Wayne, Indiana, westward and southward from the city of South Bend, Indiana, and from the city of Chicago, Illinois, eastward and southward, which it proposes to and will complete and consolidate with or transfer to said Indiana Union Traction Company, and operate the same in connection with its present system and run its cars and carry freight and passengers into said city of Indianapolis and out of said city along and over said College avenue tracks along and in front of plaintiff's property, by virtue of said franchises and contracts held by said Indianapolis Northern Traction Company and said Union Traction Company; that said Indiana Union Traction Company has continued to and does now operate said railroad with the same equipment and in the same manner as the same was operated by the Union Traction Company; that the Indiana Union Traction Company, as the successor to the rights and franchises of said Indianapolis Northern Traction Company and the Union Traction Company, under and by virtue thereof, proposes to and will shortly construct and place in operation over said College avenue and on said road large and heavy sleeping-cars for the use of travelers between the city of Indianapolis, Indiana, and the city of Chicago, Illinois, and other distant points in other states; that the number and size of the cars to be run over said College avenue will continue to increase as the business develops and the system of railroad proposed is completed, and the systems in connection therewith will be continually extended so as to reach other and more distant points outside of the city of Indianapolis; that the freight business of said road will also increase and the number and size of the freight-trains to be operated on said road will become larger; that said road and systems of roads now in operation by said Indiana Union Traction

Company and the proposed extension thereof will not be, nor will they constitute, a street railway, but will be a commercial railway, competing with steam railroads for both passengers and freight for long and short distances; that the running of said interurban cars and trains over and along said College avenue, in front of the plaintiff's premises, causes the ground to vibrate and shake the houses situated thereon, and thereby has caused the plastering on plaintiff's said dwelling-house to crack and fall off, and has caused the picture frames hanging upon the walls of the house to fall to the floor; that said noise disturbs the rest and breaks the sleep of plaintiff and her family; that, by reason of the large size of the cars and the noise made by them in running over said road, horses hitched in front of her dwelling become frightened and break loose, and the street is thereby rendered dangerous to all persons traveling thereon; that, in addition to the noise created, the cars also stir up "whirl-winds of dust," which are carried into plaintiff's house, and into other houses situated along said street, and damage and injure the furniture and carpets of her said house, and cause much additional labor to be expended in order to keep her said dwelling clean; that the interurban cars which are run over and upon said street are twice as heavy and large as the cars that are run over the street railroad of said city of Indianapolis; that the use of said College avenue, as herein shown, has rendered it unsafe and unsuitable for the ordinary travel thereover, etc. The complaint then proceeds to show in what manner said street will be rendered unsafe, etc.

It is further alleged that the use of said street by these interurban cars greatly interferes with and prevents the comfortable enjoyment by plaintiff of her said home, and causes continual annoyance, alarm and danger; that it has damaged her said real estate and diminished the value thereof $1,000; that the Indiana Union Traction Company as-

serts and claims the right to run over said College avenue, by virtue of said franchises and contracts of said Union Traction Company and said Indianapolis Northern Traction Company, all of said cars and trains of its present and future system as herein set forth, and the asserting of such claim and right increases the damages to plaintiff's property and has diminished its value at least $500 and stands and continues as a constant menace against her property, and prevents, and will prevent, the sale of the same for its fair value; that the operation on said College avenue of that part of the system which will come from the Indianapolis Northern Traction Company's road, as the same is now in process of construction, will very largely add to and increase the discomfort of plaintiff and her family, and will cause additional damage to her said property and diminish the value thereof in the sum of $1,000; that the operation of the proposed system of road over said avenue, as the same will be by said Indiana Union Traction Company completed within the next three years, will add still further to the discomfort of plaintiff and her family and the danger to them, and will very largely increase the damage to her said property and will still further diminish the value thereof in the sum of $2,500; that plaintiff has never consented to the use of said College avenue, nor any part thereof, by any of said companies for the operation of said interurban cars thereover; that no damages have ever been assessed or paid her for said use; that the companies so using the same have not, nor do they claim to have, any right to such use, other than such as they have acquired through said franchises from and contracts with the city of Indianapolis, to none of which plaintiff was a party and to none of which she gave her consent; that the present and proposed use of said College avenue in front of plaintiff's said lot by the Indiana Union Traction Company constitutes an additional servitude and easement upon her said property, which neither the public nor the city of Indianapolis, nor any of said defend-

ant companies, is entitled to hold and use without just compensation. Both the present use and the proposed use are wrongful and without right, and they constitute a cloud upon plaintiff's title to her said real estate; that she has already been damaged thereby in the sum of $2,000, for which sum she demands judgment. She also prays a decree that none of said defendants has any right to operate its said cars over and along the street in front of her said lot, save and except that of the Indianapolis Street Railway Company and the Indianapolis Traction and Terminal Company to operate and run a street-car system along same. She further demands the quieting of her title against any right or claim of any other of the defendants, their successors and assigns to run their said cars along said street until they shall have caused her damages to be assessed, as required by law, and she further prays that they be forever enjoined from so doing and asserting any right to do so, and for all other proper relief.

Appellees herein have filed an answer to appellant's assignment of errors, by which they (1) deny the errors alleged; (2) set up, and allege in bar of her right further to maintain this appeal, that on March 27, 1905, after the submission of this cause, she sold and conveyed to a person named the real estate described in the complaint; that since said date she has had no interest or title in or to said premises. In support of this answer counsel for appellees argue that under the facts therein alleged appellant is shown to have no interest in the subject-matter in controversy, and that the appeal should be dismissed. The argument advanced is that the action is to secure an injunction, with an incidental claim for damages, and that inasmuch as appellant's claim for an injunction is personal, therefore it terminated when she sold and transferred the real estate in question.

As we view the complaint, its principal theory is for damages arising out of the alleged wrongs of appellees; the

injunction being sought to prevent or restrain the continuation of these wrongs in the future until her damages can be assessed and tendered. It is true that, by selling and conveying away all her title and interest in the property described in the complaint, she, in the event the judgment below should be reversed, will be barred from securing an injunction to prevent the damages or wrongs in the future in respect to such premises. But certainly such conveyance will not operate to prevent her from recovering under her complaint any and all damages to which she is shown under the law and the facts to be entitled, and which had accrued by reason of the wrongful acts of appellees at the time she instituted this action. By the conveyance of the property she did not divest herself of the right to recover such damages. *Ft. Wayne, etc., Traction Co.* v. *Ft. Wayne, etc., R. Co.* (1908), 170 Ind. 49.

The rule is well settled that a complaint which at least states one complete and sufficient cause of action will repel a demurrer addressed to the entire pleading. If there is one complete right of action shown under the facts alleged, the plaintiff must of necessity be entitled to some recovery, and if so entitled her complaint cannot be said to be deficient on demurrer. Therefore, if, under the facts alleged by appellant in her complaint, she is entitled to a part of the relief which she demands, the pleading, under the rule to which we have referred, is sufficient on demurrer, and will serve to present for review upon its merits the question involved in this action. *Owens* v. *Lewis* (1874), 46 Ind. 488, 15 Am. Rep. 295; *Douglass* v. *Blankenship* (1875), 50 Ind. 160; *Bonnell* v. *Allen* (1876), 53 Ind. 130; *Bayless* v. *Glenn* (1880), 72 Ind. 5; *Baddeley* v. *Patterson* (1881), 78 Ind. 157; *Bennett* v. *Gaddis* (1881), 79 Ind. 347; *Decker* v. *Gilbert* (1881), 80 Ind. 107; *Boyd* v. *Olvey* (1882), 82 Ind. 294; *Binford* v. *Johnston* (1882), 82 Ind. 426, 42 Am. Rep. 508. It follows that appellees' verified answer to the assignment of errors is not sufficient to bar appellant from fur-

ther prosecuting this.appeal. We now pass to a consideration of the cause on its merits.

Counsel for appellant argue that the interurban railroad involved in this appeal is clearly shown, by the facts explicitly alleged in the complaint in regard to its character, mode and methods of operation, not to be a street railroad, but a commercial railroad, engaged in the transportation of passengers and freight between the city of Indianapolis and the cities and towns mentioned in the complaint; that the location and operation of this road over and upon the public street upon which appellant's property abuts, creates and imposes a new or additional servitude or burden, and, therefore, under the facts, she is entitled to invoke the protection of §21, article 1, of the Constitution of this State, which declares that "no man's property shall be taken by law without just compensation; nor, except in case of the State, without such compensation first assessed and tendered," and also to the protection of the 14th amendment to the federal Constitution, which prohibits the state from depriving any person of property without due process of law. The well-settled and unqualified rule in this State is that the owner of land abutting upon a public street or highway owns the land in fee to the center of the street, burdened only by the easement of the public thereon. This right or ownership of the abutter is, in the strictest sense, under the rule affirmed in this State, recognized as property, of which such abutting owner cannot be deprived without just compensation. *City of LaFayette* v. *Nagle* (1888), 113 Ind. 425, and authorities cited; *Terre Haute, etc., R. Co.* v. *Scott* (1881), 74 Ind. 29; *Terre Haute, etc., R. Co.* v. *Rodel* (1883), 89 Ind. 128, 46 Am. Rep. 164; *Board, etc.,* v. *Indianapolis Nat. Gas Co.* (1893), 134 Ind. 209.

The abutting owner, in addition to his fee simple title, has, distinct from the public in general, special interests or rights in the street or highway lying in front of his prem-

ises. Such interests or rights include that of ingress and egress. Of these special rights or interests the abutter cannot be deprived except upon appropriation by the State to public use, and then only upon payment of a just compensation. *Indiana, etc., R. Co.* v. *Eberle* (1887), 110 Ind. 542, 59 Am. Rep. 225; *Decker* v. *Evansville, etc., R. Co.* (1893), 133 Ind. 493; *Common Council, etc.,* v. *Croas* (1855), 7 Ind. 9; *Kincaid* v. *Indianapolis Nat. Gas Co.* (1890), 124 Ind. 577, 8 L. R. A. 602, 19 Am. St. 113; *Lostutter* v. *City of Aurora* (1891), 126 Ind. 436, 12 L. R. A. 259.

The cardinal question, however, with which we have to deal in this case, is real and practical. It is one to be determined, not upon any mere theory or fiction, nor upon the imaginary railway which counsel for appellees apparently have constructed in their argument, but upon the facts alleged in the complaint. Reduced to a simple proposition, it is: Does the railroad of appellees create or constitute a new or additional burden or servitude upon the street in question to that of the public easement therein? Or, in other words, is the location and operation of this railroad along and upon the street upon which appellant's property abuts such a new use or appropriation of land as will, in the absence of her consent, or condemnation proceedings, entitle her to sue for and recover damages which she has sustained? It is the settled law in this State that a "steam railroad," which at the present date is regarded by the courts and text-writers as a "commercial railroad," in distinction of a street railway, more especially for the reason that it carries both passengers and freight between towns and cities within or without the State, is, when operated over and along the public streets of a town or city, an additional burden or servitude upon such streets. *Terre Haute, etc., R. Co.* v. *Scott, supra; Terre Haute, etc., R. Co.* v. *Rodel, supra; Chicago, etc., R. Co.* v. *Whiting, etc., St. R. Co.* (1894), 139 Ind. 297, 26 L. R. A. 337, 47 Am. St. 264.

It is equally well settled that a street railway does not constitute a new use or additional burden upon the public streets over which it is operated. *Eichels* v. *Evansville St. R. Co.* (1881), 78 Ind. 261, 41 Am. Rep. 561; *Chicago, etc., R. Co.* v. *Whiting, etc., St. R. Co., supra.*

These well-established propositions are conceded by counsel for the respective parties herein, and are in accord with the great weight of authority. Originally, many of the higher courts of sister states, influenced by the view as then entertained, that a steam railroad was nothing more than an improved highway, held that it did not constitute an additional servitude when run over and upon the public streets and highways. This holding, however, after further and more careful consideration, was found to be untenable, and thereupon these courts, for a while at least, appear to have adhered to the opposite and extreme view, and held that all railroads must equally be regarded as an additional burden upon the fee of the abutting owner. It was at last, with much doubt, dissents and conflicting opinions, that the courts of this country yielded, and gave sanction to the doctrine that an urban or street railroad, propelled by animal power, was not a new and additional burden on the streets of a city. In fact this court, in *Chicago, etc., R. Co.* v. *Whiting, etc., St. R. Co., supra,* was not unanimous in the view that the location and operation of a street railroad upon public streets was not an additional burden upon the fee of the owner. The question arises, how is the line of demarcation to be drawn between urban or street railroads, which do not constitute an additional servitude, and those which do?

In *Mordhurst* v. *Ft. Wayne, etc., Traction Co.* (1904), 163 Ind. 268, 66 L. R. A. 105, 103 Am. St. 222, this court, by Dowling, J., said: ''The dedication of a street must be presumed to have been made, not for such purposes and usages only as were known to the landowner and platter at the time of such dedication, but for all public purposes,

present and prospective, consistent with its character as a public highway, and not actually detrimental to the abutting real estate.''

Let us ascertain, in the light of the authorities, the character and purpose of an urban or street railroad, which, as they declare, does not constitute a new or additional servitude upon public streets over which such road is operated. The authorities upon this question are in substantial harmony in holding that it is not the use of any particular motive power which distinguishes a street railway from a general traffic or commercial railroad. From among the many authorities we cite the following: *Williams* v. *City Electric St. R. Co.* (1890), 41 Fed. 556; *Louisville, etc., R. Co.* v. *Louisville City R. Co.* (1865), 63 Ky. 175; *Carli* v. *Stillwater St. R., etc., Co.* (1881), 28 Minn. 373, 10 N. W. 205, 41 Am. Rep. 290, 3 Am. and Eng. R. Cas. 229; *Funk* v. *St. Paul City R. Co.* (1895), 61 Minn. 435, 63 N. W. 1099, 29 L. R. A. 208, 52 Am. St. 608; *Chicago, etc., R. Co.* v. *Milwaukee, etc., Electric R. Co.* (1897), 95 Wis. 561, 70 N. W. 678, 37 L. R. A. 856, 60 Am. St. 137; *Zehren* v. *Milwaukee Electric R., etc., Co.* (1898), 99 Wis. 83, 74 N. W. 538, 41 L. R. A. 575, 67 Am. St. 844; *Schaaf* v. *Cleveland, etc., R. Co.* (1902), 66 Ohio St. 215, 64 N. E. 145; *Rische* v. *Texas Trans. Co.* (1901), 27 Tex. Civ. App. 33, 66 S. W. 324; *Hanna* v. *Metropolitan St. R. Co.* (1899), 81 Mo. App. 78; *Malott* v. *Collinsville, etc., Electric R. Co.* (1901), 108 Fed. 313, 47 C. C. A. 345; *Grand Rapids, etc., R. Co.* v. *Heisel* (1878), 38 Mich. 62, 31 Am. Rep. 306; *Chicago, etc., R. Co.* v. *West Chicago St. R. Co.* (1895), 156 Ill. 255, 40 N. E. 1008, 29 L. R. A. 485; *White* v. *Northwestern, etc., R. Co.* (1893), 113 N. C. 610, 18 S. E. 330, 22 L. R. A. 627, 37 Am. St. 639; *Eichels* v. *Evansville St. R. Co.* (1881), 78 Ind. 261, 41 Am. Rep. 561; *Harvey* v. *Aurora, etc., R. Co.* (1898), 174 Ill. 295, 51 N. E. 163; *Hartshorn* v. *Illinois Valley Traction Co.* (1904), 210 Ill. 609, 71 N. E. 612; *South, etc., R. Co.* v. *Highland Ave., etc., R. Co.* (1898),

119 Ala. 105, 24 South. 114; *Thompson-Houston Electric Co.* v. *Simon* (1890), 20 Ore. 60, 25 Pac. 147, 10 L. R. A. 251, 23 Am. St. 86; *Diebold* v. *Kentucky Traction Co.* (1903), 117 Ky. 146, 77 S. W. 674, 63 L. R. A. 637, 111 Am. St. 230; *Wilder* v. *Aurora, etc., Traction Co.* (1905), 216 Ill. 493, 75 N. E. 194; *Linden Land Co.* v. *Milwaukee Electric R., etc., Co.* (1900), 107 Wis. 493, 511, 83 N. W. 851; *Abbott* v. *Milwaukee, etc., Traction Co.* (1906), 126 Wis. 634, 106 N. W. 523, 4 L. R. A. (N. S.) 202; *South Bound R. Co.* v. *Burton* (1903), 67 S. C. 515, 46 S. E. 340; 1 Elliott, Railroads (2d ed.), §§6, 8; Booth, Street Railway Law, §1; 1 Joyce, Electric Law (2d ed.), §§28, 28a; Cooley, Const. Lim. (6th ed.), 683; 1 Lewis, Eminent Domain (2d ed.), §110a.

The reasons in the main which courts have advanced in differentiating between the ordinary street railway and what is known as a commercial railroad, and in sustaining their holding that an urban or street railroad does not constitute an added burden upon the streets of a city, are that these latter railroads in their inception were purely urban institutions, intended to facilitate travel by carrying passengers and their ordinary hand luggage from one point within the city to another, and, so far from constituting a new or additional burden, they relieved the streets of the congestion of foot passengers on the sidewalks and of vehicles upon the roadway. They were regarded as the carriages of the masses, and, in a strict sense, a convenience for the people residing or sojourning within the city. They were subject to the reasonable regulation of the municipal authorities, and their use or operation was recognized by the courts as but an improved method of using the streets and, therefore, the burden imposed by them was the same in kind as was originally contemplated or imposed when the streets were opened to public use. They were considered as affording a convenience and serving an advantage to the abutting owner, by providing for him an easy transportation from

his home to distant parts of the city.   By the development of
electricity, a new motive power was brought into use, which
has led to the construction of other railways, known as in-
terurban, which run from one city or town to another.
These roads, such as are here involved, as shown by the
facts, are engaged in the business of general commerce, i. e.,
in transporting passengers, freight, express matter and
United States mail in large and heavy cars for many miles
between the city of Indianapolis and other cities, and no
longer are a mere local convenience, but have become thor-
oughfares and competitors of the steam roads operating
within this State.   As shown, appellees are proposing and
preparing to enlarge and extend their roads until they be-
come trunk lines, connecting with railroads in adjoining
states.   In this manner, what was once a mere street rail-
way is being developed and extended beyond its original
object and purpose.   In Zehren v. Milwaukee Electric R.,
etc., Co., supra, the court held that an interurban electric
railway for the carriage of passengers, operating between
the limits of the city of Milwaukee and a country town, was
an additional burden upon the highways over which it was
located, and could not be constructed without the consent
of the abutting owner or the payment of damages.  The court,
in considering the development or change of urban or street
railways into interurban railways, and the additional bur-
den or servitude occasioned thereby, in the course of its
opinion said:   "The urban railway has developed into the
interurban railway, and threatens soon to develop into the
interstate railway.   The small car which took up passengers
at one corner, and dropped them at another, has become a
large coach, approximating the ordinary railway coach in
size, and has become a part, perhaps, of a train which
sweeps across the country from one city to another, bear-
ing its load of passengers ticketed through, with an occa-
sional local passenger picked up on the highway.   The
purely city purpose which the urban railway subserved has

developed into or been supplanted by an entirely different purpose, namely, the transportation of passengers from city to city over long stretches of intervening country. When this train or car, with its load of through passengers, is passing through a country town, it is clearly serving no township purpose, save in the most limited sense. It is very difficult to say that this use of a country highway is not an additional burden. It is built and operated mainly to obtain the through travel from city to city, and only incidentally to take up a passenger in the country town. This through travel is unquestionably composed of people who otherwise would travel on the ordinary steam railroad, and would not use the highway at all. Thus, the operation of this newly developed street railway (so called) upon the country road is precisely opposite to the operation of the urban railway upon the city street. It burdens the road with travel which would otherwise not be there, instead of relieving it by the substitution of one vehicle for many. However we regard this development of the urban into the interurban railway, it seems utterly impossible and illogical to say that it is essentially the same in its purpose or effects as the mere street railway, which was held in the case of *Hobart* v. *Milwaukee City R. Co.* [1870], 27 Wis. 194, not to be an additional burden on the fee.''

In our own State the development of interurban railways and the increase in their mileage in the last few years have far surpassed the expectations of their original promoters and organizers. During the year 1907, in addressing the State Board of Tax Commissioners, a prominent promoter of these roads said: ''The interurban business has grown beyond expectations. We did not expect to have stations to sell tickets or to have freight houses, but competition with the steam lines brought them and the business has grown and will continue to grow. In fact I do not think we are yet in the beginning of it.'' It necessarily must be apparent to all persons, who realize and recognize

the growth and extension of interurban railways in this State, and the change from passenger traffic to that of a general transportation of passengers, freight, express and mail matter between distant cities, that the city purposes which the street railway was designed to subserve have been entirely supplanted by the modern interurban railway. By the facts averred in the complaint, which, so far as well pleaded, are conceded by the demurrer to be true, we are advised that the interurban road and system in question in this case in no sense subserves the purpose of a street railway. Its cars, as a general rule, do not stop within the city of Indianapolis for the purpose of receiving passengers to be conveyed to points within the city. The road or roads do a general passenger, freight and express business between places and cities as shown, which are many miles apart. Under the facts, the road appears to be operating within the class or field to which a "commercial railroad" belongs. It does not profess to compete with street railways, but has become a competitor of commercial railroads which are engaged in the furtherance of commerce between cities and towns within and without the State. If this road has entered the field of a commercial railroad, and performs the functions of the latter, it ought to be regarded as such, and should not be accorded, under the law, privileges and rights which alone, because of their character and nature, are peculiar to urban or street railways.

An examination of the statutes of the State bearing upon these interurban roads justifies us in asserting that the legislature apparently has recognized that they were designed to be commercial roads. The general powers conferred by §5195 Burns 1908, §3903 R. S. 1881, upon companies or corporations operating commercial roads appear to have been substantially duplicated and granted by the legislature in 1903 to companies or corporations operating interurban railroads (Acts 1903, p. 92, §1, §5675 Burns 1908). (1) Both companies are given power to cause preliminary sur-

veys to be made; (2) they may receive aid by donations of real or personal property; (3) both may obtain by purchase or gift land for depots, stations, etc.; (4) they are granted the power to lay out and construct their roads to a designated width, with as much additional width as may be required; (5) each is given the right to cross highways, streams, other railroads, etc.; (6) each has the right to take, transport, carry and convey passengers and property; (7) each has the right to erect and maintain necessary depots, etc.; (8) they have the right to regulate toll; (9) they have the right to change lines; (10) they have the power of eminent domain. Interurban railways are also authorized to connect and consolidate with roads in this State and in adjoining states (Acts 1903, p. 181, §5690 Burns 1908). Where they are over five miles in length they are authorized to charge for excess in baggage, the same as steam railroads (Acts 1903, p. 225, §5190a Burns 1905). In case they operate for a continuous run of over eighteen miles they are required to provide and maintain a suitable water-closet and a tank containing drinking water in each regular passenger-car, for the convenience of the traveling public (Acts 1903, p. 250, §1, §5684a Burns 1908). They are also required to fence their rights of way, and are liable for stock killed in like manner as any other railroad (Acts 1903, p. 426, §1, §5707 Burns 1908). By an act approved February 25, 1905 (Acts 1905, p. 45, §5221 Burns 1908), it is provided: ''That any railroad company heretofore organized under the general railroad law and which has heretofore availed itself of the provisions of the act of March 9, 1903 [Acts 1903, p. 271, §1, §5219 Burns 1908], authorizing such railroad companies to operate as interurban, electric or street railways, shall have the right to haul freight, freight-cars and trains by steam locomotives.''

These powers and rights serve to indicate the dissimilarity between an interurban railroad and the one which is known and recognized as the urban or street railroad, which, as

heretofore said, subserves the purpose of the municipality over whose streets it is operated. Under the facts alleged, the interurban road in controversy does not and never has operated as a street railway in the city of Indianapolis. Its cars, and the system to which it belongs, as shown by the facts, are not intended to accommodate the local traffic of the city between points therein. Its cars are constructed for and intended to transport passengers, freight and express matter to and from distant points beyond the city of Indianapolis. It is averred that this road, "as thus constructed and operated, is and always has been a commercial railroad."

We may properly examine some of the authorities in order to discover what distinction is made between railroads which belong to the commercial class and are open to a general traffic, and which in the main are held to constitute a new use or additional burden upon the public streets and highways, and the street railroad which is used, as heretofore shown, for city purposes, and therefore is considered in line with the use for which the street was originally dedicated or appropriated. In *Magee* v. *Overshiner* (1898), 150 Ind. 127, 40 L. R. A. 370, 65 Am. St. 358, this court, in considering the well-recognized right of an abutting owner, said: "The owner of the fee in a street which has been dedicated or condemned for a street is entitled to restrict its uses to such as are proper street uses, as stated by most of the decisions, to the uses contemplated at the dedication or condemnation; the public have only an easement for the proper uses of a street. When applied to new uses the fee owner is entitled to compensation. When a use is by proper public authority, and is not an additional burden upon the fee, no compensation is due the fee owner. In the use of the public easement there is no right unreasonably to burden the fee to the special injury and damage of the fee owner."

In *Eichels* v. *Evansville St. R. Co., supra,* in considering the difference between railroads propelled by steam and

those by horses, Elliott, C. J., said: "Judge Cooley recognizes the distinction between horse railroads and ordinary steam railroads, and expresses the opinion that the laying down of a steam railroad track does add a new burden, entitling the owner of the fee to compensation, but that laying and operating a horse railroad does not." The court also quoted with approval from Cooley, Const. Lim. (4th ed.), *556, as follows: "Perhaps the true distinction in these cases is not to be found in the motive power of the railway, or in the question whether the fee simple or a mere easement was taken in the original appropriation, but depends upon the question whether the railway constitutes a thoroughfare, or, on the other hand, is a mere local convenience." The court further said: "The doctrine of the eminent jurist from whose works we have quoted is fully sustained by the adjudged cases."

As the authorities in general affirm, the motive power of the road is not a distinguishing feature between a street railway and the ordinary commercial railroad. In 1 Elliott, Railroads (2d ed.), §6, it is said: "A street railway has been defined as 'a railway laid down upon roads or streets for the purpose of carrying passengers.' The distinctive feature or characteristic of such a railway, considered in relation to ordinary commercial railroads, is that it is intended and used for the transportation of passengers and not of freight. This, and the character of the use of the street, rather than the motive power, distinguish it from the ordinary commercial railroad; and such a railway, laid in a street for the purpose of carrying passengers and facilitating its use by the public, is a street railway, no matter what motive power may be used to propel the cars." The same author further says: "Railroads operated by electricity and engaged in carrying passengers along the streets of a city are classed with street railways rather than with ordinary commercial roads. Their use being the furtherance of travel upon the streets may be said to be within

the original purposes for which the streets were dedicated and laid out, and they do not, therefore, when properly constructed, constitute a new servitude or additional burden for which abutting property owners are entitled to compensation. In this respect, as in most respects, they are governed by the same rules that apply to ordinary street railways operated by animal power, and not by the rules applicable to commercial railroads." 1 Elliott, Railroads (2d ed.), §8.

In *Williams* v. *City Electric St. R. Co., supra,* the court, in its opinion, said: "The difference between street railroads and railroads for general traffic is well understood. The difference consists in their use, and not in their motive power. A railroad * * * which runs at a moderate rate of speed, compared to the speed of traffic railroad, which carries no freight, but only passengers, from one part of a thickly populated district to another, in a town or city and its suburbs, and for that purpose runs its cars at short intervals, stopping at the street crossings to receive and discharge its passengers, is a street railroad, whether the cars are propelled by animal or mechanical power. The propelling power of such a road may be animal, steam, electricity, cable, fireless engines, or compressed air; all of which motors have been, and are now, in use for the purpose of propelling street-cars."

In *Louisville, etc., R. Co.* v. *Louisville City R. Co., supra,* the court said: "A railroad is for the use of the universal public in the transportation of all persons, baggage, and freight—a street railway is dedicated to a more limited use of a local public for the more transient transportation of persons only within the limits of the city."

In *Carli* v. *Stillwater St. R., etc., Co., supra,* the construction and maintenance upon a public street of the city of Stillwater, Minnesota, of a railroad operated by animal power for the purpose of transferring freight-cars from one line of railroad to that of another running into said city,

was held to be an additional servitude upon the street, and therefore to entitle the abutting owner to compensation. The court, in that case, said: "It is evident from all the facts that this road is not located on the street because its business is to be derived from the street, and that its purposes would certainly be equally well filled if it was on property of which the defendant should have the exclusive use. On the other hand, the public travel on the alley derives no aid or advantage from its location, but is and must be more or less impeded thereby. The public would be in every respect as well served if the road were on private property remote from the street. * * * The construction of the track on the street cannot, therefore, be said to be in aid of the public travel for which streets are created, any more than it would be if it was part of a continuous line of railroad running through the city of Stillwater. * * * The fact that the cars are moved by animal power instead of steam is not a controlling consideration."

In *Funk* v. *St. Paul City R. Co., supra,* the court, in distinguishing between commercial railroads and street railways, said: "Nor do street railways carry freight. * * * They get their business from the street, usually in populous cities, where passenger travel is the only business carried on. Street-cars do not usually run beyond the city limits. * * * 'The distinctive and essential feature of a street railroad, considered in relation to other railroads, is that it is a railroad for the transportation of passengers and not of freight.' "

In *Chicago, etc., R. Co.* v. *Milwaukee, etc., Electric R. Co., supra,* the question as virtually presented in the case at bar received a full and careful consideration in many of its phases. In that case it was held that an electric railway upon a village street, which formed a part of the connecting line between cities for transporting merchandise, personal baggage, mail and express matter, as well as passengers, constituted an additional servitude upon the lands of abutting

owners, for which they were entitled to compensation. The court, in considering the question, said: "The manifest purpose of the amendments was to authorize the construction and operation of commercial railways upon such streets and highways without consent of, or compensation to, abutting owners. The charter of the defendant company contemplates the construction and operation of such commercial railway between Milwaukee and Kenosha, which, of course, on the same theory, might be extended to Chicago. That such commercial railway upon public streets and highways, engaged in the carriage and transportation of merchandise, personal baggage, mail, and express matter, as well as passengers, would tend to obstruct and interfere with the ordinary uses of a street or highway, would seem to be quite manifest. Such use of streets and highways by such commercial railways constitutes, in our judgment, an additional servitude or burden."

In *South Bound R. Co.* v. *Burton, supra,* the court affirmed that "the operation of a railroad running to distant points is not a street purpose. It is not ordinarily used to transfer either freight or passengers from one part of the city to another and has no direct connection with the city's internal traffic or travel, which are distinctive uses of its streets."

*Rische* v. *Texas Trans. Co., supra,* was an action to enjoin the operation of what was claimed to be a street railway which was transporting freight over the streets of San Antonio. Electricity was the motive power of this road. It appeared that access to the plaintiff's premises was made inconvenient. The cars upon the road made a great noise, jarred and shook his house, and ran so fast that it endangered the lives of his family. The court in that case held that the plaintiff was entitled to damages. In passing upon the question the court said: "If the railway in question can be classed as a street railway in contradistinction to a commercial railway, then, under the general doctrine of the

courts of this and most of the other states of the Union, appellant would not be entitled to damages on the ground that streets can be legitimately used by street railways, whatever the motive power, if they are properly constructed. * * * The question then arises, what is a street railway, and can the railway of appellee be placed in that class? * * * The weight of authority, however, is that a street passenger railroad, laid on the surface or established grade of the street, is a legitimate use, while all other railroads are not.'' It was held that the road in question must be classed as a commercial railroad.

In *Hanna* v. *Metropolitan St. R. Co., supra,* the railroad company operated an electric railway between Kansas City and Independence. The question in that appeal was whether the road in controversy must be considered and regarded as a steam railroad, and thereby required to fence its right of way under the general statute of that state pertaining to ordinary railroads. It was held that the railroad was subject to the burdens of an ordinary railroad, and was not entitled to the privileges of a street railway. The court, in that case, held that the road was required to erect and maintain fences upon its right of way, as required by the general statute. In the course of the opinion it is said: ''A street railroad has been variously defined. As the name indicates, the primary meaning of street railway, or street railroad, is one constructed and operated on and along the streets of a city or town for the carriage of persons from one point to another in such city or town or to and from its suburbs. It is peculiarly an institution for the accommodation of people in cities or towns; its tracks are ordinarily laid to conform to street grades; its cars run at short intervals, stopping at street crossings to take on and discharge passengers, and its business is confined to the carriage of passengers and not freight. Booth, Street Railway Law, 1; Elliott, Roads and Sts., 557; *Williams* v. *City Electric St. R. Co.* [1890], 41 Fed. 556; *Funk* v. *St. Paul City R. Co.*

[1895], 61 Minn. 435, 63 N. W. 1099, 29 L. R. A. 208, 52 Am. St. 608.''

In *Schaaf* v. *Cleveland, etc., R. Co., supra,* the supreme court of Ohio had under consideration a case in which the question was involved as to whether an interurban electric railway, laid with ''T'' rails entirely on the side of a public highway, the company operating such road having authority to run an unlimited number of cars and trains for the transportation of passengers, freight, express and government mail, was an additional servitude upon such highway. It was held that it was; the court asserting in the course of its opinion that, ''all things considered, it is reasonably certain from the facts found, that the practical operation of such a road, within its capacity, must necessarily produce annoyance and inconvenience to the plaintiffs, and interfere with their property rights as abutting owners, of the same general character that result from the operation of steam railroads, and become an additional burden on the public highway, and taking of the plaintiff's property, in the same sense.''

In *Wilder* v. *Aurora, etc., Traction Co., supra,* an electric railroad forming a part of an interurban system, which was authorized to carry freight as well as passengers, baggage, mail and express matter, is held to be a commercial railroad, and to constitute an additional burden on the fee of a public street in said city of Aurora, Illinois. This road was intended to be a part of a railroad system extending from the intersection of North river and Walnut streets, the entire length of Walnut street, to the western limits of the city of Aurora, and there connect with the tracks of the Aurora, etc., Traction Company, thereby forming a continuous electric railroad to the city of Rockford by way of the city of Dekalb. The court in that case, in passing upon the question whether the road involved was a street railroad or a commercial railroad, said, on page 527: ''If the road so to be constructed be regarded as merely a street railroad, it

cannot be regarded as an additional servitude, and the appellant is not entitled to injunction against its construction even though he is the owner of the abutting property and of the fee of the street in front thereof to the center of the same. * * * A railway, authorized to carry freight as well as passengers, becomes a commercial railroad, instead of a street railroad, and such railroad, when laid in a street, becomes an additional burden on the fee, and cannot be laid without the consent of or compensation made to the adjoining property owner. *Linden Land Co.* v. *Milwaukee Electric R., etc., Co.* [1900], 107 Wis. 511, 83 N. W. 851. * * * In our opinion, the railroad to be constructed under appellee's charter, and under the ordinances authorizing it to lay its tracks in the streets of Aurora, is what is called a commercial railroad, and is not a street railroad within the definite and fixed meaning of the latter term. Being a commercial railroad, it constitutes a new and additional servitude upon the fee of the property owner to the center of the street.'' The court in that case quoted with approval from 1 Lewis, Eminent Domain (2d ed.), §110a, wherein the author says: ''Railroads now exist in great variety as regards motors and motive power, the size and style of cars and coaches and methods of operation and construction. It is probable that these variations will be multiplied in the coming years. It is doubtful whether any permanent and satisfactory classification can now be made. There has been a general concurrence, however, in embracing all railroads in two divisions or classes; (1) commercial railroads, and (2) street railroads. Commercial railroads embrace all railroads for general freight and passenger traffic between one town and another, or between one place and another. * * * Street railroads embrace all such as are constructed and operated in the public streets for the purpose of conveying passengers with their ordinary hand luggage from one point to another on the street.'' The same author

·further states: ''Considering all the cases and having due regard to the weight of authority and the trend of judicial opinion we should say that the general doctrine to be extracted from the street railroad cases is that a railroad is a legitimate street use provided, first, that the road is devoted exclusively to street passenger traffic, and, second, that its track is laid to conform to the surface of the street, and so as to obstruct ordinary travel as little as possible. This excludes a road with cuts and fills, because of the cuts and fills. It excludes the elevated railroad, because of the elevation of the tracks above the surface and the superstructure which such elevation makes necessary. It excludes the commercial railroad because of the nature of its traffic.'' 1 Lewis, Eminent Domain (2d ed.), §115h.

That an electric railway to be operated between two cities in different states and to carry passengers and freight is not a street railroad, but a commercial or trunk railroad, is declared and held in *Diebold* v. *Kentucky Traction Co., supra.*

Many more quotations from the decisions of the courts and the works of the text-writers, in addition to the above, might be given to show that a street railroad is one of a local character as contradistinguished from a commercial railroad, but to do so would unnecessarily extend this opinion.

Keeping in view the principles asserted by the authorities to which we have referred, we may next inquire, in the light of facts and the law applicable thereto, what is the character of the road or roads with which we have to deal in this appeal, and into what class are they placed under the facts as alleged in the complaint. Briefly summing up the facts, we have here presented a traction company with a thirty-year franchise to run passenger-, baggage-, express- and freight-trains. There are no limits to the size of its cars or trains; no limit to the number of trains, nor the rate of speed at which they may be propelled. Tracks laid with ''T'' rails as heavy and of the same pattern and shape as

those of the ordinary railroad passenger-cars. The company is actually engaged in operating its electric cars and trains from the city of Marion to the city of Indianapolis, a distance of eighty miles, and from the city of Muncie to Indianapolis, a distance of sixty miles, operating both freight- and passenger-cars. The cars are sixty feet long, and carry 150 passengers. Twenty-eight regular passenger-cars or trains run daily in and out of the city of Indianapolis. Many cars and trains are used exclusively for hauling freight a distance of from ten to eighty miles, a greater part of which is hauled forty miles and over. Eight of the passenger-trains make but one stop between Indianapolis and Muncie, and stop only once between the limits of the city of Indianapolis and the terminal station, a distance of four miles, crossing more than fifty streets within the city of Indianapolis. Its through cars do not stop to take on passengers after leaving the terminal station. Its passenger-cars frequently run in trains of three cars, and it runs freight-trains consisting of three and more cars every day. Passenger-cars are provided with baggage compartments for trunks and ordinary baggage, water coolers and closets, and are twice the size of the cars run upon the street-car lines in Indianapolis. Outside 'of the city cars run from forty to sixty miles per hour, and within the city and over College avenue at a rate of twenty to thirty miles per hour. Outside of the city of Indianapolis the road is not operated upon the public highway, but on a private right of way, paralleling the Big Four Railroad to Marion and Muncie. It is not intended to, and does not, do a local business, but a through business in travel and freight. It charges a rate of fare forbidden to be charged by a street railroad in Indianapolis and refuses transfers, which the statute absolutely requires from a street railroad operating in the city of Indianapolis. It is extending and will complete lines to Chicago, Illinois, Columbus, Ohio, and Ft. Wayne, Indiana, and proposes to and will put on sleeping-cars to run on

through cars and trains between the aforesaid cities and other points, thereby transporting all of its traffic over College avenue. It is not a street railroad, but a "commercial railroad," carrying persons and freight in competition with steam roads both for long and short distances. It shakes the ground, etc., and has damaged plaintiff, as charged in the complaint, etc.

Certainly these facts show that there is a wide difference between the railway here involved and what the many authorities which we have cited recognize and regard as an urban or street railway. The fundamental purpose of the road here involved appears not to be to accommodate or subserve the travel upon the streets of the city of Indianapolis, but, on the contrary, it is shown to be a thoroughfare between the latter city and other cities or points for the distance of many miles beyond. In its purposes, uses, equipments and mode of operation it is materially different from the urban or street railroad, except that it employs electricity as a motive power. It is shown frequently to run passenger-trains composed of three large cars, and to run daily freight-trains of a like number of heavy cars. It is neither a street railroad in fact, nor is it shown to be operated for street railroad purposes. Further to emphasize, we have, under the facts, a railroad which in no sense is operated to promote the utility of the public streets of the city of Indianapolis. It is not merely engaged in doing business between the latter city and its suburbs. It is not an extension of a city street railway over intervening territory between neighboring cities or towns, carrying passengers and light freight, but it is absolutely an independent railway, engaged in a general passenger and freight traffic between distant cities and communities. Its cars are not light and small when compared with those of the ordinary steam roads. As a result of its operation some of the usual discomforts due to the operation of the ordinary steam roads are present, viz., loud noises, dirt and dust,

shaking or vibrations of the ground, and other annoyances or detriments which affect the owners of abutting property situated on the streets over which the road is operated. There is also the presence of danger or peril which continually menace the safety of persons using the public street. Possibly it may be said that a difference in degree in respect to these matters exists. But the question presented is not as to whether it constitutes a burden to the same degree as that imposed by a steam railroad, but is it a burden upon the public street in addition to that to which it was originally dedicated or appropriated? Surely, under the circumstances, this road, in its character and operation, so nearly approaches the ordinary steam commercial railroad that a dividing line between it and the latter cannot consistently with reason be drawn. Consider the road and the system to which it belongs all in all, in our opinion it comes clearly within the class of commercial railways, which, as said in 1 Lewis, Eminent Domain (2d ed.), §111, "embraces all railroads for general freight and passenger traffic between one town and another, or between one place and another." If this character of a commercial road cannot be accepted to test the question in regard to its being an additional servitude upon the fee of the public streets, when, then, and under what circumstances, can the line of demarcation be drawn between roads which constitute a new use of the streets and an added burden thereon and those which do not? While it may be conceded that the use of the public streets by appellees for the operation of their railways is quite a matter of economy in their favor, still such use, as shown in this case, is a diversion from and incompatible with the public use to which the streets were originally dedicated or appropriated, and is, therefore, an additional burden upon the fee of the abutting owner, for which the latter is entitled to compensation.

We have examined the cases cited by counsel for appellees. Many of these apply to street railways and deal with

the difference between such of these roads as are run by ani-
mal power and those which are operated by electricity.
Some of the cases, notably those of the courts of California,
apparently adhere to the view that no railroad constitutes
an added burden.   The courts of Maine, Oregon and Ken-
tucky, and possibly some others, appear, to an extent at
least, to entertain this liberal and antiquated view.   This
broad doctrine, as our decisions show, has no sanction in
this State, and the decisions of these latter courts, of which
we have made mention, cannot be regarded or accepted as
influential authorities in the determination of the question
presented in this appeal.   The case as made by the facts
herein is quite different from the one presented under the
facts in *Mordhurst* v. *Ft. Wayne, etc., Traction Co.* (1904),
163 Ind. 268, 66 L. R. A. 105, 103 Am. St. 222, and the two
cases are easily distinguishable.   It may be said, however,
that the latter case is to be confined to the facts upon which
the court based its opinion, and is not to be extended beyond
its fair import.   The case just cited was an action by an
abutting owner to enjoin the defendant from constructing
and operating an interurban railway over the public streets
of the city of Ft. Wayne.   The rights, powers and duties
of the defendant company in that case, in the construction
and operation of its road over the streets of that city, ap-
pear to have been defined by an agreement between the
city's board of public works and the defendant company.
The railway in that case was limited by the agreement in
question in its operation to running one, or, by special con-
sent of the board of public works, at the farthest, two cars
at a time, and to the carriage of mail, light express and
passengers.   Dowling, J., in that case said: ''To determine
the sufficiency of the ground upon which the right of the
plaintiff rests, we must look to the contract between the city
and the railroad company, and not to the allegations of ex-
pected violations of that agreement by the company.   If the

use of the streets by the defendant in the manner and upon the conditions described and set forth in the contract would not create a new and additional burden upon the street and a deprivation of the plaintiff's beneficial interest therein, then he is not entitled to any injunction against the construction of the road. Future breaches of that contract, or violations of its terms by the company, resulting in special damages to the property of the plaintiff, may hereafter entitle him to maintain an action against the company for such injuries, but the mere anticipation of such breaches and injuries cannot authorize the court to enjoin the construction and operation of the railroad. It is important, then, to ascertain from the agreement itself what rights in the use of the streets, and in Fulton street among them, were granted to the railroad company, and upon what conditions the company was authorized to use these streets.''

It is further said in that appeal that ''cheap transportation of passengers, light express and mail matter between neighboring towns and cities may be quite as necessary and as largely conducive to the general welfare of the places so connected and their inhabitants as the like convenience within the town or city. Where such transportation is furnished by an interurban electric railroad operated under the conditions and restrictions contained in the agreement between the appellee and the city of Ft. Wayne, we do not think the construction and operation of such a railroad in such a manner constitutes an additional servitude upon the street which entitles abutting property owners to compensation.'' It will be observed that the court in that case tied its holding or conclusion down to the facts, conditions and restrictions contained in the agreement between the city and the railroad company.

When this latter case is considered in the light of the facts upon which the court based its holding, it is manifest that there is a radical difference or distinction between it

and the case at bar.   In that case the road in controversy
had not been constructed.   It was only in expectancy, and
the court viewed the averments of the complaint in respect
to the detrimental results of its operation as not justified by
the facts.   The results anticipated were regarded as imagi-
nary or fanciful.   In the case before us, however, we are
dealing with a road, and a system of which it forms a part,
as already constructed, and which has been in full operation
for several years.   The results due to its location and opera-
tion are shown to be actually detrimental to the abutting
property of appellant, and it is disclosed that she has sus-
tained actual damages.   In the case of *Mordhurst* v. *Ft.
Wayne, etc., Traction Co., supra,* the road in question was
held, under the facts, to be consistent with the use of the
street by the abutter and the general public, and it was said
by the court to be a road, if not directly beneficial to abut-
ting property, at least not detrimental.   Applying the prin-
ciples asserted and the limitations mentioned in this latter
case, it would follow that the complaint here involved states
a cause of action sufficient on demurrer.

Appellant, having sold and transferred her property,
therefore the question as to her right, under the facts, to be
awarded injunctive relief is not considered, but in passing
we may say that, in sustaining her right under the facts to
recover damages, we do not mean, in addition thereto, to
hold that she has the right to exclude appellees from the
use, in operating their roads under the franchises granted
by the city, of the public street upon which appellant's
property abuts.

Montgomery, J., concurring in this opinion, we hold
that under the facts alleged and the law applicable there-
to, as expressed in the foregoing opinion, the complaint here-
in states a right of action for damages on the grounds:   (1)
That the operation of appellees' roads constitutes an addi-
tional burden or servitude upon the public street in ques-

tion upon which appellant's property abuts; and (2) that she is entitled to recover the special damages which she is shown to have sustained by the operation of appellees' railroads. The lower court, therefore, erred in sustaining the demurrer to the complaint, for which error the judgment should be reversed.

The majority of the court, however, have reached the conclusion, and so hold, that under the facts averred in the complaint and the law applicable thereto, appellees' 2. railroads do not constitute an additional burden or servitude upon any of the public streets of the city of Indianapolis; that the complaint states a cause of action in favor of appellant only for the recovery of the special damages which she has sustained, as shown by the 3. facts alleged, and for this reason only it is held by the majority that the lower court erred in sustaining the demurrer to her complaint. The judgment is, therefore, reversed, and the cause remanded, with instructions to the lower court to overrule the demurrer to the complaint, and for further proceedings not inconsistent with the holding of the majority of this court.

HADLEY, C. J.—I am of opinion that plaintiff states in her complaint facts sufficient to entitle her to recover special damages, but I am unable to agree that the operation of interurban cars, within the scope of the charter rights of the company, on the tracks and with the permission of the local street railroad company and the city authorities, is such a new and additional servitude to the plaintiff's land underlying College avenue as will entitle her to recover compensation therefor.

The far-reaching importance of the question involved constrains me to state some reasons for the conclusion I have reached.

The principal question may be thus stated: Is an interurban electric railroad, such as was within the legislative

intent when it authorized the organization and oper-
2.   ation of such railroad over College avenue, in the city
of Indianapolis, an additional servitude on the fee
of the soil occupied by the street? A public street is a pub-
lic highway, and means a strip of ground set apart by con-
demnation, or by gift and dedication, as a public passage-
way, which every citizen has the right to use on the same
terms.   2 Bouvier's Law Dict. (Rawle's ed.), 1049.   El-
liott, Roads and Sts. (2d ed.), §16; *City of Indianapolis* v.
*Higgins* (1895), 141 Ind. 1.   When ground is appropriated
as a public highway, it is taken over by the State, in trust,
for the common use and benefit of all the people, and in ac-
cepting the trust the State impliedly assumes the obligation
to maintain it as a public way, free from unnecessary ob-
struction, and open to the safe and convenient passage of
the public, and to its trade and commerce.

*Town of New Castle* v. *Lake Erie, etc., R. Co.* (1900), 155
Ind. 18, 23.   The State, for convenience, apportions its
highways among the various political divisions of the state
government—that is to say, to counties, townships, cities,
and towns—for construction, care and maintenance, but it
has assiduously reserved to itself the right to supervise the
use, management, and control of such ways, whether urban
or rural.

The power of collecting revenues for the construction
and maintenance of highways, for making permanent im-
provements of both streets and country roads, is not only
conferred on the above-named governmental agents, but the
mode and manner in which such power shall be exercised is
specifically pointed out by legislative decree, and must be
closely followed.   Elliott, Roads and Sts. (2d ed.), §545, and
cases collated; *Town of New Castle* v. *Lake Erie, etc., R. Co.,*
*supra.*   Any obstruction or invasion of the integrity of the
highway, rendering it unsafe or inconvenient for public use,
is an offense against the State, and not the municipality.
§2043 Burns 1901, §1964 R. S. 1881.   Erecting a stable in

the street (*Boyer* v. *State* [1861], 16 Ind. 451); maintaining a fruit-stand on the sidewalk (*State* v. *Berdetta* [1880], 73 Ind. 185, 38 Am. Rep. 117); stopping a railroad train on a street crossing (§2297 Burns 1901, §2176 R. S. 1881); running horses through, or shooting along, streets (*Flinn* v. *State* [1865], 24 Ind. 286); and running traction engines over streets (§2044 Burns 1901, Acts 1889, p. 428, §1)— are all unwarranted interferences with the public use of the streets, and are punishable by the State. For an instructive lesson as to the breadth of the powers asserted by the General Assembly over the highways of the State, and particularly the streets, see what is enjoined upon cities of the first class (Indianapolis) in the granting and regulation of rights to street railroads. The statute provides that the city shall require, by contract, of any company granted the right to operate a street railroad within the city, a definite franchise period, the rate of fare to be charged, the method of propulsion, the right to demand a change thereof to secure better service, that said company pave between its tracks, and keep the same in repair under the supervision of the city engineer, extend its tracks in the streets when required by public convenience, and permit the use of its tracks by any incorporated interurban railroad company to some central point in the city, to discharge and receive passengers, the board of works to designate the tracks to be so used. In brief, the city is required to reserve the right to exercise such control over the operation, construction and maintenance of the city railroad lines as will secure efficient and first-class service to the public. Acts 1899, p. 260.

The public nature and legislative control of streets and other highways is clearly stated by Mr. Dillon in the following language: "Public streets, squares, and commons, unless there be some special restriction, when the same are dedicated or acquired are for the public use, and the use is none the less for the public at large, as distinguished from the municipality, because they are situate within the limits

of the latter, and because the legislature may have given the supervision, control, and regulation of them to the local authorities. The legislature of the State represents the public at large, and has, in the absence of special constitutional restraint, and subject (according to the weight of more recent judicial opinion) to the property rights and easements of the abutting owner, full and paramount authority over all public ways and public places. 'To the commonwealth here,' says Chief Justice Gibson, 'as to the king in England, belongs the franchise of every highway as a trustee for the public; and streets regulated and repaired by the authority of a municipal corporation are as much highways as are rivers, railroads, canals, or public roads, laid out by the authority of the quarter sessions.' " 2 Dillon, Mun. Corp. (4th ed.), §656.

Another fundamental principle: It is the law of this State that a general grant of a highway to the public, whether set apart by dedication or condemnation, unless otherwise expressly provided, carries with it nothing more than an easement of the right to use the land in the manner and for purposes consistent with a public highway. *Cox* v. *Louisville, etc., R. Co.* (1874), 48 Ind. 178; *Chicago, etc., R. Co.* v. *Whiting, etc., St. R. Co.* (1894), 139 Ind. 297, 26 L. R. A. 337, 47 Am. St. 264. The fee in the soil over which the highway runs remains in the dedicator, or in him from whom the easement has been appropriated, and the conveyance of a lot abutting on a city street, thus acquired, carries with it the fee in the soil to the center of the street. *Board, etc.,* v. *Indianapolis Nat. Gas Co.* (1893), 134 Ind. 209; *Coburn* v. *New Tel. Co.* (1901), 156 Ind. 90, 52 L. R. A. 671. It follows that the plaintiff, being the owner in fee of a lot abutting on College avenue, in the city of Indianapolis, is also the absolute owner in fee of the soil to the center of the street, subject only to such servitude as is imposed upon it by the appropriate uses of an urban public highway. It is, therefore, perfectly clear that neither a

corporation, nor the city, nor the legislature itself, has authority or power to subject the plaintiff's property to any use or burden inconsistent or inappropriate to the highway easement, without rendering her compensation, as required by the Constitution. *Lostutter* v. *City of Aurora* (1891), 126 Ind. 436, 12 L. R. A. 259; *Terre Haute, etc., R. Co.* v. *Bissell* (1886), 108 Ind. 113. While the powers of the legislature over the streets, and other highways, are very broad, it must be understood that those powers relate only to the preservation, maintenance and regulation of such highways in furtherance of the original design as a common and convenient way for all the people. Elliott, Roads and Sts. (2d ed.), §22.

The plaintiff must bear all the annoyances and inconveniences incident to a proper use of the street, and has no ground of complaint until the roadway in front of her property is subjected to a use unwarranted by the dedication. What, then, were the uses contemplated by the dedication? Generally speaking, travel and transportation. It will not do to confine them to the modes and usages known to the owner at the time of the dedication. The grant was to the public then present, and to come, and impliedly for any efficient mode or means, not materially detrimental to the abutters, that might thereafter become necessary to the free and convenient use by the public for purposes of travel, traffic and communication. *Mordhurst* v. *Ft. Wayne, etc., Traction Co.* (1904), 163 Ind. 268, 66 L. R. A. 105, 103 Am. St. 222; *Coburn* v. *New Tel. Co., supra; Magee* v. *Overshiner* (1898), 150 Ind. 127, 40 L. R. A. 370, 65 Am. St. 358. Any reasonable means or modes that promote or facilitate these ultimate ends are consistent with the dedication. As we said in the case of *Coburn* v. *New Tel. Co., supra:* "In sparsely settled towns and cities public necessity requires but little of the servient owner beyond the right of unobstructed passage over the street, but as cities become populous and towns crowded with traveling foot-

men and vehicles, public necessity increases with the multitude, and whenever the necessity exists, any use of the street by reasonable structures and devices,   *   *   *   and which does not materially obstruct the ingress and egress, and light and air, to abutting property, is within the contemplated purpose of the dedication, and not a new burden upon the fee.'' The doctrine of the case just cited rests upon the principle that it was foreseen, at the time of the dedication, that the population would increase, and congregate in our cities and towns till the streets would become crowded and congested with passing footmen and vehicles, and that the introduction, in such cases, of any discovery or new method that will relieve the streets, facilitate intercommunication, and diminish the dangers and discomforts of the jostling crowd, without material injury to abutters, will be a proper use of the street as a public highway. As the uses of the village street are expected to expand to meet the exigencies of the increasing public, new and improved modes are expected to respond to the new requirements. It was the application of these principles that brought the telephone poles and wire in to the curb line of the streets, and none will gainsay that the use of these wires, in the city of Indianapolis, dispenses with thousands of passages through the streets every day. It likewise brought the street-car, confined to a fixed track in the middle of the street, first fourteen feet long, drawn by horses, and capable of carrying a dozen passengers; then about twenty-two feet long, propelled by electricity, with capacity for twenty-five passengers, and which has been since developed into cars forty-four feet long and capable of carrying 125 passengers. The masses of the people are transported to and from the places of their employment by these cars, to the great relief of the streets. As things are, it is seldom that one is delayed, annoyed or put to inconvenience, in his passage through the streets, either as a pedestrian or in a vehicle; but what would happen to Indianapolis if the street-cars

and telephones were removed from her public ways, without the substitution of other means of travel and communication of equal efficiency?

It is settled in this, and most other states of the Union, that the use of telephones and street-cars, being in aid of the public easement, is a proper use of the street, and not an additional burden upon the fee in the soil underlying it. *Mordhurst* v. *Ft. Wayne, etc., Traction Co., supra,* and cases cited.

What, then, constitutes an interurban railroad, such as is authorized to occupy the streets of Indianapolis, and wherein does it differ from the ordinary commercial railroad authorized in 1853, and the street railroad authorized in 1861? The character of the legislation upon the subject, which we will briefly notice, will furnish us the most reliable answer.

It is enough to say of the ordinary railroad that it came when the population was diffused, transportation difficult and slow, and it generally contemplated large enterprises, great distances, a carriage of all kinds of freight, expensive power, and long, heavy and infrequent trains, the track to be laid upon its own independent grade with elevated rails, and upon private property, and not on the streets and highways, save in exceptional cases for the convenience of urban population.

The original design of the street railroad was the antithesis of the steam railroad. It was to lay its tracks in the streets and highways, to be operated by the running of single cars at brief intervals and frequent stops, thereby constituting a new and useful mode of using the highway for convenient passage. Let us see how the General Assembly has indicated this purpose.

In the first place, the legislature of 1861 deemed it necessary to pass another and different act from that of 1853, to authorize the operation of railroads in streets and highways. The act of 1861 (Acts 1861, p. 75), was entitled "An act to provide for the incorporation of street railroad companies."

It was enacted that such company may, by consent of the common council, construct its tracks, switches and turnouts upon the streets of the city or town under the conditions and restrictions that they shall conform exactly to the established grade of the street, the free passage of which shall not be obstructed beyond what is necessary in the operation of the cars, and all street crossings to be constructed so as to be passable and in as good condition as any other portion of the street.

As an evidence that the legislature did not mean to confine the street railroad to municipal limits, in 1865 (Acts 1865, p. 63) an act was passed giving to such companies the right to extend their street-car tracks beyond the corporation limits, on any state or county road, by consent of the county commissioners. This act was amended in 1879 (Acts 1879 [s. s.], p. 175), so as to give the right to build an independent street railroad outside of any city, on any public highway, to which the county commissioners would yield their consent.

In anticipation that freight-cars might become necessary, or at least a proper means of conveying property through the streets of our large cities, it was enacted in 1891 (Acts 1891, p. 137, §59, §3830 Burns 1901) that in cities of more than one hundred thousand the board of public works, with the consent of the common council, might purchase or erect street-car or other lines for the conveyance of passengers and freight.

In 1899 (Acts 1899, p. 408) an act was passed requiring all street-car companies, organized under the incorporation act of 1861, and operating a railroad in any city of more than one hundred thousand inhabitants (Indianapolis), to permit the use of its tracks by any incorporated passenger interurban railroad company to some central part of the city, to receive and discharge passengers; and, evidently to avoid further incumbrance of the street with structures, it was provided in said act ''that such suburban or entering

company shall not erect other poles or lay any additional rails in or on any such streets, alleys or highways already occupied.''

Remembering that we speak of street railroads, or railroads of the same kind, different only in name, that may do all and only the things that street railroads may do, according to legislative intention, we come to the act of 1899 (Acts 1899, p. 378, §5468i *et seq*. Burns 1901), entitled ''An act to authorize the consolidation of two or more street railroad companies,'' etc. It provides that, upon effecting the consolidation, the new company shall cause notice thereof to be recorded in the recorder's office of the different counties through which the road of such company may run. It also authorizes any street railroad company, organized under the laws of this State for the purpose of building a street railroad, to build such road from any point in the State to the State line, thus making it clearly manifest that the legislature intended that the railroad authorized by consolidation to run through more than one county, and from any point in the State to the State line, was to be nothing more nor less than the street railroad, with identical powers and obligations.

A very significant act was passed in 1901 (Acts 1901, p. 461, §5468a *et seq*. Burns 1901), entitled ''An act concerning street railroad companies, granting additional rights and powers,'' etc. It provides, among other things, that any street railroad company, heretofore or hereafter organized, shall, in addition to the rights and powers already given to street railroad companies by law, have the right of eminent domain; also the right to construct and operate railroads connecting cities and towns; also the right to regulate the time and manner in which passengers and property shall be transported.

It will be noted that this act grants, not to interurban, but to street railroad companies, additional rights and

powers; and among these additional rights and powers is the right to construct interurban roads connecting cities and towns, and to regulate passenger and property transportation. This act is a distinct recognition that a company organized under the street-car act of 1861, *supra,* may construct and operate a street railroad, an interurban or suburban railroad, and that any act not warranted by the charter of the street railroad company is forbidden the interurban company.. In other words, whatever, in the operation of its railroad in the city of Indianapolis, would be wrongful and constitute negligence, or *ultra vires,* in the city company, would be none the less wrongful in the interurban company.

While it cannot be said that authority from the legislature and city, to enter the streets of Indianapolis on the rails of the local street-car company, will, of itself, prejudice or affect the question of additional servitude, yet, the unmistakable purpose of the General Assembly to confine the rights and powers of the interurban companies strictly within the charter rights of the street-car companies, which are declared by the courts to be in aid of the common public use, and not a new burden to the street, is of value as indicating the design of that body so to limit the operation of interurban roads, at least within the cities, as to make their presence of no greater or different burden to the streets than that of the street railroads. *Indiana, etc., R. Co.* v. *Eberle* (1887), 110 Ind. 542, 546, 59 Am. St. 225, and cases cited.

Then what may a street railroad company, organized to operate a street railroad within the city of Indianapolis, rightfully do within the limits of its charter? It may adopt any means for the transportation of persons and property, not harmful to the abutter, not inconsistent with any proper use of the highway, and useful and efficient in facilitating the passing and repassing of persons and freights through the streets. There is, in general dedica-

tions and appropriations, no limit to the number of people and vehicles that shall have the right to pass a street in a suitable manner, and no abutting lot owner has any cause of complaint or for damages on account of the number, however much the annoyance, and however much the ingress to and egress from his property is interfered with. So any mode of transportation, unattended by a countervailing nuisance, and that removes the crowd from the streets, and makes public travel freer and safer, and the abutter's property more accessible and enjoyable, is a suitable and consistent use of the street for which it was originally taken. *Briggs* v. *Horse R. Co.* (1887), 79 Me. 363, 10 Atl. 47, 1 Am. St. 316.

We know, as a matter of history, that the street-car, from its earliest introduction, has been, and still is, essentially a one-car system, intended as an aid to the public easement. It was designed to occupy the public thoroughfares, in populous communities, its tracks to conform to the exact grade of the street, so as to deprive no traveler of any part of the street, and no abutter of the free ingress to and egress from his property; the cars to be run at a moderate rate of speed, at short intervals and with frequent stops; to take up passengers and discharge them at their destination, without delay, and before they shall accumulate in large numbers in the streets; to run slowly and with little momentum, and thereby enable the driver to keep it constantly under control. Any other method of operation in the streets would be incompatible and inconsistent with the general highway use. Trains of cars are disallowed as being unsuitable and unnecessary to the public requirements, therefore inconsistent with highway uses. Long trains occupy long intervals in passing, cause undue obstruction in the street, and delay to those who desire to pass over the track at street crossings. To illustrate: The single car, forty-four feet long, running at the rate of eight miles an hour, will clear the roadway of a cross street

in about two seconds, and cause the traveler on the street only a momentary pause. But a train of three cars, each sixty feet long, or one hundred eighty feet in all, such as the complaint alleges are run over College avenue, will not only occupy a large amount of space in the street, but consume several seconds in passing a given point, and thus materially and wrongfully interfering with the free use of the cross streets. Street and interurban cars may also become so numerous and frequent on certain streets as to constitute a public nuisance, but this may easily be remedied by the city authorities sending some of them to other tracks, as we shall hereafter see they have full power to do.

Undoubtedly the chief business of a street-car is the carrying of passengers, but there appears in the law of the highway no objection to its carrying light and package freight. It has, perhaps, always been the custom in Indianapolis to carry, for its passengers, hand baggage, filled and unfilled market baskets, tool boxes, baby carriages, clothes baskets, and all manner of small articles and packages that may be conveniently handled from the platform; also, to carry, without an accompanying passenger, the United States mail from the central office to the various substations of the city; likewise a large number of packages of newspapers from downtown offices, and depots receiving consignments from St. Louis, Cincinnati, and Chicago, to the hundreds of distributing points throughout the city.

Repair and construction materials, and perhaps some private freight, are hauled through the city in the local company's cars, and no complaint is heard, nor inconvenience manifested.

Besides, what principle can be advanced in condemnation of the inclosed, reasonably sized, neatly constructed freight- or express-car? Was not the transportation of property over the roads and streets as deeply seated in the dedicatory

purpose as the passage of persons? Plainly the reasons that justify the one support the other. The heavy drays and wagons employed in handling the commerce of the city are a greater obstruction to the street, and menace to the safety of those using it, than the number of pedestrians. Therefore a suitable car, comparatively noiseless, confined to a fixed track four or five feet wide, in the center of the street, to which track vehicles may be safely adjusted by keeping to the right, and which car will carry twenty fold more freight or express than a wagon occupying the same amount of space in the street, and meandering in an irregular track, cannot, for any sufficient reason, be declared a nuisance, or an improper use of the street. No use should be held improper that produces no extra hazard, and makes the way easier, safer and more convenient as a passageway for the public in common.

The further legislative purpose manifested by the foregoing enactments was to obviate the localization of street railroads. Any purely local use of a thoroughfare is inconsistent and subversive of the common public right to use it on equal terms, from end to end. The second act passed (Acts 1865, *supra*) was to authorize the extension of a street railroad into the country over public highways. The third (Acts 1879, *supra*), was to authorize the construction of street railroads, independent of, and outside of, the city limits. In the nature of things, street railroads, and no other means or modes adopted as expedients in the proper use of the public easement, can, on the same terms, be enjoyed by one class of citizens and denied to another. The State is trustee of all the highways, and holds them as a system for intercommunication and exchange for all the people of the State in city and country. All must be treated alike, without reference to his place of residence, for the privilege is a highway right that belongs equally to all citizens of the State. A street railroad is not, and can-

not be made local in any other sense than that it receives the principal part of its business from the residents of the city.

If a city street-car is run out into the country and returns loaded with rural passengers, and passes over the streets in the usual manner, will anyone say that carrying the out of town passengers over the streets is an unwarranted use thereof? This is just what has happened almost daily for a year on at least two interurban railroads that send their cars in and out of the terminal station. And what difference can it make to the dwellers on the streets traversed, in the value and enjoyment of their property, whether the car that brings the nonresident passengers into the city belongs to this company or that, if it is of the same, or of a proper, size and kind, and operated in the same manner?

And what about the freight- or express-car? It will be taken for granted that urban population need frequent communication with the country, and the country folk, the city. Each has indispensable wants of exchange with the other. The cities require the products of the farms, as much as the residents of the country require the markets of the city. Primarily considered, these exchanges cannot be effected without the transportation of persons and property from one section to another, over the public highways provided for that purpose. A freight- or express-car, propelled by electricity, of reasonable size, enclosed, neatly painted, and made attractive in appearance, sent into the country ten, twenty or more miles, and loaded with milk, fruit, berries, vegetables, and other products of the country, and, while sweet and fresh, hurried to the consumers in the city, passing over the streets at a rate of speed regulated by the city authorities and allowed to the city cars of a similar size, will clear the streets of twenty or more unsightly wagons, that would be required to convey to the city the same amount of stuff contained in one car. Assum-

ing this to be a fact, I can see no reason why the running of such a car over the streets should be adjudged inconsistent with the original design and purpose of the dedication, and a new burden to the street.

As expressed by Mitchell, J., in *Cater* v. *Northwestern Tel., etc., Co.* (1895), 60 Minn. 539, 63 N. W. 111, 51 Am. St. 543, 28 L. R. A. 310: "If there is any one fact established in the history of society and of the law itself, it is that the mode of exercising this easement is expansive, developing and growing as civilization advances. * * * Hence it has become settled law that the easement is not limited to the particular methods of use in vogue when the easement was acquired, but includes all new and improved methods, the utility and general convenience of which may afterwards be discovered and developed in aid of the general purpose for which highways are designed." And further in the same opinion the learned judge continues: "It seems to us that a limitation of the public easement in highways to travel and the transportation of persons and property in movable vehicles is too narrow. In our judgment, public highways, whether urban or rural, are designed as avenues of communication; and, if the original conception of a highway was limited to travel and transportation of property in movable vehicles, it was because these were the only modes of communication then known; that as civilization advances, and new and improved methods of communication and transportation are developed, these are all in aid of, and within the general purpose for which highways were designed. Whether it be travel, the transportation of persons and property, or the transmission of intelligence, and whether accomplished by old methods or by new ones, they are all included within the public 'highway easement,' and impose no additional servitude on the land, provided they are not inconsistent with the reasonably safe and practical use of the highway in other usual and necessary modes, and provided they do not unreasonably impair

the special easements of abutting owners in the street for purposes of access, light, and air." To the same effect see *Montgomery* v. *Santa Ana, etc., R. Co.* (1894), 104 Cal. 186, 37 Pac. 786, 25 L. R. A. 654, 43 Am. St. 89; *DeGrauw* v. *Long Island Electric R. Co.* (1899), 43 Hun, App. Div., 502, 60 N. Y. Supp. 163.

A distinguished author says: "When land is taken or dedicated for a town street, it is unquestionably appropriated for all the ordinary purposes of a town street; not merely the purposes to which such streets were formerly applied, but those demanded by new improvements and new wants. Among these purposes is the use for carriages which run upon a grooved track; and the preparation of important streets in large cities for their use is not only a frequent necessity, which must be supposed to have been contemplated, but it is almost as much a matter of course as the grading and paving." Cooley, Const. Lim. (6th ed. by Angell), 683.

There appears no sound reason for pronouncing an interurban railroad, organized under the street railroad law of this State, an additional burden to the street, on the sole ground that it is a commercial railroad, and therefore classed with steam roads. According to the clear weight of authority, it is the nature of the business, and manner of its authorized operation, and not the commercial character of a railroad, nor the power that propels its cars, that determines whether it is in accord with legitimate highway purposes, or a new use, and incompatible therewith. In the case of *Mordhurst* v. *Ft. Wayne, etc., Traction Co.* (1904), 163 Ind. 268, 66 L. R. A. 105, 103 Am. St. 222, in touching upon this point it was said, with the unanimous approval of the court: "This distinction does not rest upon a difference in name—one being denominated a street railroad or passenger railroad, and the other a commercial or freight railroad—nor upon the motive power employed, nor upon the kind of rails used, nor upon the length of the railroad.

It results from the nature of the business done by each of the two kinds of railroads, and the physical agencies and manner by which and in which that business is carried on. Those of the one are consistent with the use of the street by the lot owner and the general public, and, if not directly beneficial to the abutting real estate, are not detrimental to it. They relieve the streets from some of the burdens of travel upon it, they facilitate travel between different parts of the city, and they enhance the value of abutting property by increasing the convenience of access to it. The business of the other class of railroads, and the means by which it is necessarily carried on, require the service of entirely dissimilar agencies and methods. Great trains of cars moving along the streets, or standing upon them, are real and serious obstructions to all other uses of the highway. Such trains make a loud noise by day and by night, and disturb the quiet of neighborhoods. Access to abutting property is rendered difficult and dangerous, and the jarring and shaking of buildings is annoying to the occupants, and often injurious to the structures themselves. If the cars are propelled by steam, then there is the additional inconvenience of smoke, cinders, sparks, the blowing off of steam, the ringing of the engine bell, and the whistling of the locomotive. There are good and substantial reasons why compensation should be paid to the owners of abutting lots when a street in a city is used for such a purpose and in such a manner.'' To the same effect see *Briggs* v. *Horse R. Co.* (1887), 79 Me. 363, 10 Atl. 47, 1 Am. St. 316.

Country wagons, large and small, carrying almost every kind of freight, may come from an indefinite distance in the country, and pass over College avenue, singly or in trains, and no one will think of complaining, or of calling in question their right to do so. The way was acquired and set apart for that purpose, in part, and everybody acquiesces in it. If this same freight were collected and placed in a car, and run in the streets of Indianapolis, at a speed

authorized by the city authorities and by the franchise contract of the city company, in what sense would the plaintiff receive a new injury by the passage of the car on College avenue, in lieu of the wagons that might otherwise have passed in front of her property? There can be no new damage without a new injury. And what difference can it make in the enjoyment of her property whether the contents have been transported by the car from the corporation line, or from a distant point in the country? It can only affect the plaintiff or her property in the passing; and it is as much commerce in the wagons as in the cars.

No adjudication is of value in determining a question under consideration without a knowledge of the facts upon which the case is built. Under this rule, we challenge the value, as precedents, of many of the cases relied upon by appellant. At least two of the roads referred to and adjudged to be additional burdens are but connecting links between two steam traffic railroads, and are used in passing freight-cars from one road to another.

A very similar question to the one before us arose in Alabama. In the case of *Birmingham Traction Co.* v. *Birmingham R., etc., Co.* (1898), 119 Ala. 137, 24 South. 502, 43 L. R. A. 233, the appellant was a company incorporated as a street railroad company, and engaged in the construction of a railroad from Birmingham to Gate City, to be propelled by electricity. Appellee brought injunction to enjoin appellant from constructing its road through a street in the town of Woodlawn, to which the town had given consent, the fee of said street being in the appellee, until appellee's damages had been assessed and paid, as for an additional servitude. The court in summing up said: "It may be said that there is almost unanimity in the adjudications that such uses are legitimate uses of streets, by permission of municipal authority, without any right of the owner of the fee to compensation."

In the case of *Newell* v. *Minneapolis, etc., R. Co.* (1886),

35 Minn. 112, 27 N. W. 839, 59 Am. Rep. 303, 24 Am. and
Eng. R. Cas. 298, the defendant's railroad, beginning at a
central point in the city of Minneapolis, was laid in a
street, conforming to the grade thereof, for a distance of
two miles to the city limits; thence, via Lake Calhoun and
Lake Harriet, for a further distance of eighteen miles to
Lake Minnetonka. The cars, thirty-seven feet long, within
the city are propelled, either singly or in trains of from two
to four cars, by enclosed steam-engines, twenty-one feet
long, having the appearance of a short car, except for the
smokestack extending a foot above the top. No bell or
whistle is used. The steam is exhausted in the engine, an-
thracite coal is used for fuel, they run at a speed of from
four to six miles an hour, stop at street corners for pas-
sengers, and a uniform fare of five cents is charged within
the city. This occupancy of the street was held to be a
proper highway use, and not an additional burden. The
court said, in part: "When a street is being used for the
purpose  *  *  *  of the passage of persons and property,
but objection is made to the mode of use, the question of
rightfulness depends upon whether the use objected to is
consistent or inconsistent with the common public use, in
which every person is entitled to share.  *  *  *  It is not
every mere inconvenience or temporary hindrance to which
one person, in using a street, may be subjected by the man-
ner in which another uses it, which presents a case of incon-
sistency with the common public right.  *  *  *  But no
merely technical or trifling interruption or obstruction is to
be regarded as a substantial impairment, for common sense
requires that these words should receive a liberal and rea-
sonable construction, and it must always be borne in mind
that in organized civil society the individual must neces-
sarily enjoy a common public right with reference to the
general convenience and the rights of others."

I therefore conclude upon this point that interurban cars
of suitable size, construction and finish, for the carriage

of passengers, express packages and light freight, with permission of the city authorities, may be run singly into the city of Indianapolis, upon the tracks of the local company, laid according to the law regulating street railroad tracks in city streets, to a point within the city, and over the tracks first designated by the board of public works and common council, at a reasonable rate of speed, not exceeding that allowed by law or ordinance to the cars of the local company, and in conformity to such city regulations as the authorities may from time to time impose upon street-cars operated in the streets of the city, and with the sanction and under regulation of the city authorities, temporarily, and in times of emergency created by special occasion, such a reasonable and limited number as shall be required to meet the transient wants of the public for passenger carriage, provided such increased number, in size and manner of operation, is in substantial conformity to the authorized custom of the local company on like occasions, and does not materially increase the burden of the highway easement, nor unduly interfere with other proper and legitimate uses of the street.

For an instructive and comprehensive collation of the recent adjudications bearing on the subject discussed, reference is made to extended notes to *Mordhurst* v. *Ft. Wayne, etc., Traction Co.* (1904), 106 Am. St. 222, and 66 L. R. A. 105.

An answer to the assignment of errors pleaded in bar of appellant's right to maintain this appeal sets up that, since the submission of the cause, appellant has sold

1.    and conveyed the property described in the complaint, since which conveyance it is alleged she has had no interest in said property. As we understand the theory of the complaint, it is an action in the nature of an *ad quod damnum* to recover compensation for imposing upon the fee of her soil a new servitude and other special damages, with incidental injunction asking that the wrongs

be enjoined until her damages have been assessed, and paid or tendered, under the doctrine announced, in *Indiana, etc., R. Co.* v. *Allen* (1888), 113 Ind. 581. The answer before mentioned is of no avail. By the conveyance of her property appellant did not part with any claim for damages against appellees for the grievance set forth in the complaint, which had accrued to her before the commencement of this action. *Ft. Wayne, etc., Traction Co.* v. *Ft. Wayne, etc., R. Co.* (1908), 170 Ind. 49. If entitled to any redress her cause should not be dismissed because not entitled to injunctive relief.

Let us return to the complaint, the sufficiency of which to state a cause of action being the ultimate question. It is, in substance, alleged, that the appellees run over 3. College avenue in front of appellant's house, cars, both passenger and freight, that are sixty feet in length, and often in trains of three cars each, or one hundred eighty feet in all, at the rate of twenty or thirty miles an hour, by reason whereof the ground is made to vibrate and shake the house of appellant, situated sixty feet from the track, so as to cause the plastering to break off and fall, and her picture frames to fall from the walls and break; that the noise and vibration disturb her sleep, frighten horses hitched in front of her house and cause them to break away, and the street is rendered dangerous to all persons traveling thereon.

If the appellant can prove these averments she is entitled to recover, not because the right to operate interurban cars on College avenue imposed a new and additional burden on her property, but because such cars have been operated in front of her house in an unjustifiable and unlawful manner. We have seen that a company operating interurban cars over the streets of Indianapolis has no greater nor different rights or powers than the local street railway company, and that whatever is not suitable and appropriate in the local company, in the use of the street as

a public and common passageway, is not allowed to the interurban company; that the limitation of their rights and powers within the city are precisely the same and drawn from the same source. We have also seen that the street-car is peculiarly and essentially a one-car system, of limited and reasonable speed, and if the appellees have exceeded these rights they have gone beyond their charter limits; and if, by the exercise of a wrongful usurpation of power, they have injured the appellant, they must respond in damages, whether the principle be called negligence in operation, or *ultra vires*. As was said in the case of *Mordhurst* v. *Ft. Wayne, etc., Traction Co., supra,* on page 281: "The railroad company will be liable to the abutting lot owner for any special injury to his property occasioned by the negligence of the company in constructing its railroad or in operating it. Nothing that we have said in this opinion is to be understood as denying or in any degree abridging that right."

In my judgment, therefore, the appellant is not entitled, under the complaint, to recover from appellees compensation for a new and additional burden upon her lot, but may recover any special damage to her property that has resulted from an unauthorized and wrongful operation of appellees' cars in front of her dwelling. I, therefore, vote for a reversal of the judgment to enable appellant to submit to the jury the question of the special damages alleged.

GILLETT, J.—To most of the conclusions announced in the opinion of Mr. Chief Justice Hadley I unreservedly assent. The public streets within the territorial limits of the State belong to the people thereof, and the particular dominion over them which municipalities enjoy is a trust for the benefit of the people at large. It is also my opinion that the interurban car, which tends more than almost any other material influence to make the resi-

dents of country and city a homogeneous people, is a proper vehicle on the city street.    Public interests point to the fact that the interurban car should be recognized as a · proper means of using the streets.    To deny it the use of the public ways in large cities would be to take from the service a large part of its flexibility and facility.    As a vehicle, the interurban car conduces to the advantage of the traveling public, by permitting passengers to enter or leave the conveyance in the heart of the city, or at intersecting streets, and, in the transportation of property, it is thereby made possible to receive and discharge packages along the line of travel, and, at some points, to load and unload considerable quantities of freight at the merchant's door.    It is a most important fact that the interurban freight-car greatly relieves the congestion of busy streets, since it furnishes a more practical means of handling traffic that must necessarily be thereon.    Between the shipper or the consignee of freight and the railroad terminal there is distance, and this implies traffic by wagon.    It would involve a shameful economic waste, as well as a decided prejudice to the city, for a railroad company, of any kind, to condemn or acquire a private right of way to a central terminal, although it is evident that the location of a more remote terminal would involve a greater amount of teaming upon the streets.    As the use of the interurban car is reasonably consistent with other street uses, it is practicable to use the public ways as a means whereby such cars may reach conveniently located terminals—in fact, it is the only means—and, figuring that the average haul would be least from a station in the exact business center of the city, it would seem to be fair to assume that, as between such a location and one more remote, for every ·block that an interurban car, carrying the equivalent of twenty wagon loads of ·local freight, moves, it takes off of the streets the burden of twenty wagons traveling the same distance.    As this freight must be upon the streets in any event, and as it may be moved

thereon with perhaps not more than one-twentieth of the disturbance to the public that the required number of wagons would occasion, it is plain that, so far from such cars increasing the burden of the streets—regarded collectively—they could not, in the nature of things, handle enough freight, local or otherwise, to equal the burden of additional teaming which terminals comparatively remote from the business center would occasion. It is therefore plain that while the use of the streets by interurban cars creates additional traffic on some streets, yet it greatly relieves other streets. When once a reason, founded in the local public interest, is found for admitting the interurban freight-car to the use of a street in reaching its terminal, there is, within the authorities generally, no difficulty in affirming the right to burden other streets with such cars, for the advantage is local, and it is simply a question of the power to redistribute traffic, of the authority to burden some streets with additional traffic to secure relief to congested streets in the central part of the city. As an abstract proposition, no one would doubt the existence of such a power, and I can perceive no objection to it in the concrete, since the use is not new, but is merely the ancient one of travel, by an improved means, consistent with general street uses. As has been frequently said, the easement of travel upon an urban way is very comprehensive, and as long as the use is within the assumed purposes of the appropriation, and reasonably consistent with other street uses, I do not think that the abutter can in most circumstances have ground of complaint.

As to the allegation that the cars of said companies do not stop to receive and discharge passengers between their terminal and the city limits, I have to say that, in view of the legislative history of such corporations, as well as the general nature of their vehicles and traffic, it must be presumed that it was never intended by the legislature that, when they elected to use an urban way longitudinally, it should

be without full obligation to be under the regulation of local laws to compel them to furnish needed service upon the street. In other words, I attempt to judge of this class of corporations by what they were designed in law to be, and by what they can by law be required to do. It is only in this manner that we can perceive their relation to the urban way. The question of appropriation cannot depend upon the existence of a local ordinance, or upon whether the company voluntarily makes necessary stops, for conditions in these respects may frequently change—they may have changed many times since this suit was brought— and the question must be determined by the fundamental relation of such lines to urban ways. If they are to be regarded by the law wholly as thoroughfares, it is doubtful whether it would be competent for even the police power of the State to compel them to serve local uses, except to the extent that steam railroads must do so. It is true that in that event the abutter might urge his claim of compensation with more reason, but I am unwilling to admit that these corporations, which owe their existence to the street railroad act, can be permitted to occupy the streets of our cities without being liable to have their lines made ancillary to street travel. If such lines are thoroughfares pure and simple, then they have acquired rights in our city streets under false pretenses, and municipalities, being unable to regulate them as conveniences upon the street, must expect to see the camel's body follow the head into the tent. I take no such view of the relation of these lines to urban ways. They have come in as operating street-cars carrying passengers and freight, and are liable to be regulated by local ordinances, so that they shall be compelled to receive and discharge persons and property along the street to the full extent that may be necessary to make them efficiently discharge their duties as carriers upon the public ways. See *Indiana R. Co.* v. *Calvert* (1907), 168 Ind. 321.

As it is not to be expected that the local authorities will fail, in the exercise of their police power over the streets, to see to it that adequate service is rendered by corporations which use the streets by a method which is but ancillary to the ordinary uses of public ways, I am of the opinion that the running of separate interurban cars upon a city street is not—at least under ordinary circumstances as to traffic—an additional burden. Reasoning from the postulate that the highways of the State belong to the people at large, it is not controlling that an interurban line is not a purely local institution. The cars of such a road, when operated in a city, do not materially interfere with the abutter, nor are they antagonistic to the rights of persons upon the street; and as they materially augment the convenience of the public—as distinguished from the carrier —which possesses the easement of travel thereon, such a line should be particularly distinguished from that of a steam railroad, the presence of which upon a city street is for the sole convenience of the carrier, besides being largely subversive of the travel thereon, and, for reasons which have often been pointed out, extraordinarily burdensome to the abutter.

With scarcely an exception, it is held by the courts of the various states that a local, surface, electric railroad is not an additional burden. Note to *Austin* v. *Detroit, etc., Railway* (1903), 2 Am. and Eng. Ann. Cas. 530, 535; note to *Mordhurst* v. *Ft. Wayne, etc., Traction Co.* (1904), 106 Am. St. 222, 232, 244. With the fact admitted, that the streets of the State belong to the whole people, it seems to me that it must also be held that an interurban line is not *per se* an additional burden, since it is in aid of what is proper street travel and traffic. There is no substantial difference in burden between the local and the interurban car, and I perceive no ground in principle for a distinction between them.

As long ago as the year 1894, this court held, in *Chicago,*

*etc., R. Co.* v. *Whiting, etc., St. R. Co.* (1894), 139 Ind. 297, 26 L. R. A. 337, 47 Am. St. 264, that a company operating an electric line some thirteen miles long, extending on streets and highways from the city of Hammond, and through the municipalities of East Chicago and Whiting, to a point on the Illinois state line, was not an additional burden to the interest of the abutter upon a city street. The editor of the Lawyers Reports Annotated observes, in reporting that case, that although it seems to be one of first impression, yet it is upon a very important question of railroad law. There are cases which hold that an electric line upon a rural highway is not an additional burden. *Ranken* v. *St. Louis, etc., R. Co.* (1899), 98 Fed. 479; *Cincinnati, etc., St. R. Co.* v. *Village of Cumminsville* (1863), 14 Ohio St. 523; *Georgetown, etc., Traction Co.* v. *Mulholland* (1903), (Ky.), 76 S. W. 148; *Austin* v. *Detroit, etc., Railway* (1903), 134 Mich. 149, 96 N. W. 35, 2 Am. and Eng. Ann. Cas. 530. In *Mordhurst* v. *Ft. Wayne, etc., Traction Co.* (1904), 163 Ind. 268, 66 L. R. A. 105, 106 Am. St. 222, the company was engaged in carrying passengers, mail and light express matter in interurban cars, and, after a careful consideration of the question in all of its bearings, it was held that the running of such cars on a city street, in accordance with the municipal regulations set out in the opinion, did not constitute a burden upon the fee.

It is a fact of general knowledge that millions of dollars have been invested in the development of the interurban business since the case of *Chicago, etc., R. Co.* v. *Whiting, etc., St. R. Co., supra,* was decided, and that no inconsiderable portion of that capital has been invested since the decision in the case of *Mordhurst* v. *Ft. Wayne, etc., Traction Co., supra.* The question therefore arises whether, as between the extremes in other states, we should not endeavor to grasp the principle upon which our own decisions rest, and, in the absence of controlling reason to the contrary, hold fast to it as a rule of property?

I recognize the fact that upon any question of general application the Constitution should not be subordinated to court-made law; but, in a matter of this kind, the meaning of the Constitution is not involved. The question is only as to the application of its undoubted meaning to a certain class of cases. Even upon a question so important as to the authority of congress to delegate its legislative power, as it had attempted to do by virtue of a certain statute relative to the sale of mineral lands, we find the Supreme Court of the United States saying: ''Whatever doubts might exist if this matter were wholly *res integra,* we have no hesitation in holding that the question must be considered as settled by prior adjudications and cannot now be reopened.'' *Butte City Water Co.* v. *Baker* (1904), 196 U. S. 119, 49 L. Ed. 409, 25 Sup. Ct. 211.

It is safe to say that, with reference to the question whether cars operated on rails in a city street constitute an additional burden, there is no class of cases in which the courts of the states have differed so widely. Judge Redfield, writing many years ago, refers to what he terms the singular vacillation of the courts on the subject, and, after speaking of the first disposition to treat steam railways merely as improved highways, and of the fact that in the process of retrocession there was an unnatural impulse to hold that all railways must equally be a burden upon the fee, he adds: ''Whether the proper distinction between street railways and those occupying a distinct route and transacting mainly a distinct business will ever be clearly defined is perhaps questionable.'' 1 Redfield, Railways (6th ed. by Kinney), *312. It must therefore be evident that, unless there be some yielding of individual judgment, on a matter of this kind, to what has been decided, we will have a condition of instability in the court most greatly to be deplored. It is better for the public interest that the law upon a point of this character should be settled wrong than that it should come to be regarded as eternally unset-

tled. One can but perceive the note of impatience with which the court, in *Minnesota Mining Co.* v. *National Mining Co.* (1865), 3 Wall. 332, 18 L. Ed. 42, disposed of the attempt again to draw into ·review a question which the court regarded its own adjudications as settling. ''Where questions arise,'' said the court, ''which affect titles to land, it is of great importance to the public that when they are once decided they should no longer be considered open. Such decisions become rules of property, and many titles may be injuriously affected by their change. Legislatures may alter or change their laws,‚ without injury, as they affect the future only; but where courts vacillate and overrule their own decisions on the construction of statutes affecting the title to real property, their decisions are retrospective and may affect titles purchased on the faith of their stability. Doubtful questions on subjects of this nature, when once decided, should be considered no longer doubtful or subject to change. Parties should not be encouraged to speculate on a change of the law when the administrators of it are changed. Courts ought not to be compelled to bear the infliction of repeated⁰ arguments by obstinate litigants, challenging ·the justice of their well-considered and solemn judgments.'' See, also, *Lindsay* v. *Lindsay* (1874), 47 Ind. 283.

I regard the case of *Chicago, etc., R. Co.* v. *Whiting, etc., St. R. Co.*, *supra*, as going far toward the settlement of the question at bar, and it is absolutely controlled by the case of *Mordhurst* v. *Ft. Wayne, etc., Traction Co.*, *supra*. It must be evident, especially in view of what has already been said, that in the case before us the fact that the use involves the carriage of property—as in the case last cited —affords no just ground for holding that thereby an additional burden is created. *Montgomery* v. *Santa Ana, etc., R. Co.* (1894), 104 Cal. 186, 37 Pac. 786, 25 L. R. A. 654, 43 Am. St. 89; *Taylor* v. *Portsmouth, etc., St. Railway* (1898), 91 Me. 193, 39 Atl. 560, 64 Am. St. 216; *Howe* v.

*West End St. R. Co.* (1896), 167 Mass. 46, 44 N. E. 386; *White* v. *Blanchard Bros., etc., Co.* (1901), 178 Mass. 363, 59 N. E. 1025; *State* v. *Dayton Traction Co.* (1899), 18 Ohio C. C. 490; *Nichols* v. *Ann Arbor, etc., St. R. Co.* (1891), 87 Mich. 361, 49 N. W. 538, 16 L. R. A. 371; *Austin* v. *Detroit, etc., Railway* (1903), 134 Mich. 149, 96 N. W. 35; *San Antonio, etc., St. R. Co.* v. *Limburger* (1895), 88 Tex. 79, 30 S. W. 533, 53 Am. St. 730; Nellis, Street Surface Railroads, p. 5. And see *DeGrauw* v. *Long Island, etc., R. Co.* (1899), 43 Hun, App. Div., 502, 60 N. Y. Supp. 163. While it was in the transportation of passengers that the utility of street-cars was first perceived, so that we have become accustomed to regard street-cars as a means of conveying passengers, yet the use of such cars for the transportation of property upon the public streets ought not to mislead us as to the underlying principle, for such transportation is a primary use of public ways. I may further add, that the suggestion that the companies are operating commercial railways appears to me as affording no ground in principle for holding that the abutter is entitled to compensation, for all railways, urban or otherwise, if conducted for private gain, are commercial railways. The use of this term may be justified in referring to ? class of railways which occupy the street solely for their own convenience; but if an interurban railway is upon the street for the convenience of the public, it will at once be perceived that, so far as its being commercial is concerned, its presence there can be quite as abundantly justified as in the case of an ordinary street railway.

I am not at this time prepared to sanction the process of reasoning in Mr. Chief Justice Hadley's opinion, by which he reaches the conclusion that interurban companies are limited by their charter in their operation of cars. Before passing upon this question I should desire to study all cognate statutes and to test every link involved in the reasoning—an opportunity not now afforded me. And I

may further add that I perceive no necessity for deciding a question of such great importance. There is more of reason for holding that, in view of their organization, when such companies elect to use urban ways, the character of the use compels them to use vehicles which approximate street-cars, because they are then indeed cars of the street; but, without expressing any ultimate opinion upon the subject suggested, I prefer to rest my opinion upon the ground that it is not shown by the complaint that these companies have extraordinary rights on the street.

If it appeared that said companies, acting within their charter and contract rights, were engaged in the operation of long trains of cars upon a city street, it would have to be affirmed that such use constituted an additional burden upon the fee. And here I may say that, in my judgment, mere acts of aggression on the part of such a company are not to be treated as amounting to an appropriation, but as wrongful acts for which another remedy should be sought. In other words, an appropriation must be by an *intra vires* act; an unlawful possession of a public street would in most instances be a nuisance.

At the time these interurban companies entered the city of Indianapolis, the municipality enjoyed a grant of exclusive power over the streets, and no company could enter without authority therefrom. §§3830, 5458d, 5458k Burns 1901, Acts 1891, p. 137, §59, Acts 1899, p. 260, §§2, 9; *Indianapolis Cable St. R. Co.* v. *Citizens St. R. Co.* (1891), 127 Ind. 369, 8 L. R. A. 539; *Chicago, etc., R. Co.* v. *Whiting, etc., St. R. Co., supra; City of Indianapolis* v. *Navin* (1898), 151 Ind. 139, 41 L. R. A. 337; *Indiana R. Co.* v. *Calvert* (1907), 168 Ind. 321. Appellant's complaint alleges that "by the terms" of the contract of said interurban companies there is no limitation upon the number of cars or trains they may run. This, I take it, is not equivalent to an allegation that the contract permits such companies to run trains. It appears to me that this

allegation, at the most, can only be taken as a statement of the fact that the expressed "terms" (that being the ordinary meaning of the word) of the contract are silent as to the extent of the right, and from this counsel for appellant argue that the right is unlimited. I do not think that this follows. It was said in *Indianapolis Cable St. R. Co.* v. *Citizens St. R. Co.*, *supra*: "A grant made by the commonwealth, or by a municipal corporation, under authority of the commonwealth, is to be taken most strongly against the grantee, and nothing is to be taken by implication against the public, except what necessarily flows from the nature of the terms of the grant." See, also, *Muncie Nat. Gas Co.* v. *City of Muncie* (1903), 160 Ind. 97, 60 L. R. A. 822; *State, ex rel.*, v. *Board, etc.* (1906), 166 Ind. 162, and cases cited. It is laid down in Vattel's rules, which he applies to treaties, statutes and compacts, that "if * * * a manifest equity, or a great common utility requires a restriction, we ought to adhere to the most limited sense which the proper signification can admit, even in an affair that appears favorable in its own nature." Potter's Dwarris, Statutes, 131.

A contract is to be construed with reference to the known characteristics of the business to which it relates. *Ohio Oil Co.* v. *Detamore* (1905), 165 Ind. 243; *Dill* v. *Fraze* (1907), *ante*, 53. As late as 1905, a former president of the American Institute of Electrical Engineers stated, in an article in the August number of the Century Magazine, p. 512, entitled "The Electric Railway:" "Save on elevated and underground roads of short length, it has been essentially a service of single cars at frequent intervals and convenient stops." If this may be assumed to be a fact, it may well be questioned whether such companies on entering a city should not ordinarily, as a matter of construction, be held to the requirement that they carry on their traffic in single units. In any event, without clear authority, they

cannot encumber the streets with long trains, and upon an indefinite grant they should be held down to a means of conducting their business not substantially more burdensome than street-cars. *DeGrauw* v. *Long Island, etc., R. Co., supra; People, ex rel.,* v. *Newton* (1889), 112 N. Y. 396, 19 N. E. 831, 3 L. R. A. 174; *City of Aurora* v. *Elgin, etc., Traction Co.* (1907), 227 Ill. 485, 81 N. E. 544; 1 Morawetz, Priv. Corp. (2d ed.), §§316, 323; 4 Thompson, Corporations, §5345; Nellis, Street Surface Railroads, p. 5. The law will not unnecessarily construe a grant to a corporation by the public as carrying with it an extraordinary and oppressive authority. *Northwestern Fertilizing Co.* v. *Hyde Park* (1878), 97 U. S. 659, 666, 24 L. Ed. 1036.

Being compelled to carry freight in other than long trains, it appears to me that the field of interurban endeavor in the carriage of property, owing to steam railroad competition, must be limited to the carriage of light freight for comparatively short distances. It may be assumed that the city, acting under its police power, will see to it that noisome things and substances are not carried. And it should, perhaps, be presumed that, if business develops so as to require it, the city, acting under such power, will require the traffic to be divided with other streets. *Baltimore* v. *Baltimore Trust, etc., R. Co.* (1897), 166 U. S. 673, 41 L. Ed. 1160, 17 Sup. Ct. 696. And see *Indiana R. Co.* v. *Calvert, supra,* and cases cited. I am not prepared to say, in view of the allegations of appellant's complaint, that the development of traffic by interurban cars might not at some time be such that it would at least interfere with appellant's appurtenant rights; but especially in the absence of averment showing a right in appellees which, as at present exercised, is unduly burdensome to the abutter, I do not think that the present is a time to have a reckoning with the future in respect to the matters which appellant fears.

So far as special damages are concerned, based on the im-

proper operation of said roads, I concur in the general opinion of my associates that a cause of action is stated, and for that reason I vote for a reversal. In view of appellant's conveyance, the question of injunction is a moot question.

MONKS, J.—I concur in the conclusion reached by Hadley, C. J., and Gillett, J., that the running of interurban cars upon city streets is not an additional burden, and that appellant is not entitled to recover therefor; and also in their conclusion that there are allegations in the complaint which sufficiently charge a special injury to appellant's real estate, caused by appellees in operating said road, under the rule declared in *Mordhurst* v. *Ft. Wayne, etc., Traction Co.* (1904), 163 Ind. 268, 281, 66 L. R. A. 105, 106 Am. St. 222, and for this reason alone the court below erred in overruling the demurrer to the complaint.