[Civ. No. 2436.    First Appellate District.—October 17, 1918.]

CITY OF ALBANY, Appellant, v. UNITED STATES FIDELITY AND GUARANTY COMPANY (a Corporation), Respondent.

MUNICIPAL CORPORATIONS—CITY OF ALBANY—STREET RAILWAY FRANCHISE—BOND OF GRANTEE—VALIDITY.—In this action against the surety on a bond, given by the grantee of a city franchise for the construction and maintenance of a street railway as security for the faithful performance by such grantee of the conditions of the grant, it is held that the bond was not void for want of capacity in the city to grant the franchise.

ID.—EFFECT OF GRANT—FRANCHISE IRREVOCABLE.—A franchise for a street railroad under the Broughton Act (Stats. 1905, p. 777), became at the moment of the grant, an irrevocable contract and the property of the grantee, of which he could not be divested during the time he was required to commence work, and after commencing the work a forfeiture was impossible before the expiration of the time limit of three years for completing it.

ID.—FRANCHISE TO GRANTEE AND HEIRS.—A franchise to the grantee, his heirs, successors, and assigns was not personal to the grantee, but vested at his death in his heirs.

ID.—DEATH OF GRANTEE.—At the death of the grantee, the work could have been completed by his legal representatives or by his bondsmen.

ID.—NONCOMPLETION OF WORK—LIABILITY OF SURETIES.—When, at the death of the grantee of the franchise, his representatives and his bondsmen decided not to go on and complete the work, the franchise was lost to them, but the liability on the bond remained for the benefit of the city.

ID.—DISTINCTION BETWEEN STREET RAILWAY AND RAILROAD.—Courts have not adopted any fixed rule of construction distinguishing a street railway from a railroad.

ID.—RIGHT TO CARRY PASSENGERS, FREIGHT, EXPRESS AND MAIL.—If a city wishes to have a railway within its confines that shall carry passengers, freight, mail and express, it may do so, there being nothing in the statutes of the state which expressly prohibits it.

APPEAL from a judgment of the Superior Court of Alameda County.    J. J. Trabucco, Judge Presiding.

The facts are stated in the opinion of the court.

Ostrander, Clark & Carey, and W. H. Morrisey, for Appellant.

Thomas, Beedy & Lanagan, for Respondent.

LENNON, P. J.—In this case judgment was rendered for the defendant; plaintiff moved for a new trial; the motion was denied and plaintiff appeals from the judgment. The facts of the case, in brief, are as follows:

The city of Albany, proceeding under the provisions of the Broughton Act (Stats. 1905, p. 777) duly granted to E. A. Gowe, his heirs, successors, and assigns, a franchise for the construction and maintenance of a street railway over a right of way approximately one-half mile in length, all within the boundaries of that city. Gowe, as required, thereafter furnished a bond in the sum of five thousand dollars, executed by the respondent herein, a corporation for such purposes and receiving premiums therefor. This bond recited the grant of said franchise to the parties aforesaid, its terms and conditions, and guaranteed the faithful performance of each and every condition upon the part of said Gowe.

Gowe commenced work within the time limited and actually completed about one hundred feet. He died. Thereafter no further work was performed and the railway was never completed. At the expiration of the three-year period within which the work was to have been accomplished—no further time having been granted therefor—the city of Albany, appellant herein, brought this action against respondent to recover upon its bond.

Respondent contends that the giving of the bond was without consideration—not that it did not receive its premium therefor—but that the franchise itself was void for want of capacity in the city to grant a franchise which provided:

1. That the railway might carry freight, mail and express as well as passengers;

2. What the fare should be from the city limits of Richmond to the city of Albany *if* the owner of the franchise granted should *ever* operate a road to the former place as a connection or extension of the Albany road;

3. For the furnishing of electric lights of two thousand candle-power for each block of the streets covered by the fran-

chise *whenever required* by the board of trustees of the city of Albany;

4. For the placing of poles *used in connection* with the railway inside of curb lines and of wires at sufficient heights to avoid obstruction of ordinary use of such streets;

5. For restricting competition and favoring one bidder over another.

Respondent also contends that the condition of the bond was not broken because Gowe died before he was required to begin work under the terms of the franchise.

The latter contention may be discussed and disposed of first. Gowe evidently took the franchise in good faith, went to work expeditiously, accomplished the laying of about one hundred feet of the road and died well within the period of time when, by the terms of the franchise, work upon the road was to have been commenced.

At the instant of the grant of the franchise, the franchise became an irrevocable contract and the property of E. A. Gowe, of which he could not be divested by the city of Albany for a period of four months, during which time he was to commence work. By his own activity in commencing operations, he made a forefeiture at the expiration of four months an impossibility and secured to himself, his heirs, successors, and assigns, the absolute right to a time limit of three years from the date of the grant to complete the work—a right which the city of Albany could not gainsay, and which effectually prevented any action on its part toward obtaining railroad accommodations for its citizens along those thoroughfares.

At Gowe's death, his rights vested in his heirs and his estate. The work could have been completed by them, or by his legal representatives, or by his bondsmen. They elected not to do so. They are bound by that election. The franchise is lost to them, but the liability on the bond remains for the benefit of the city of Albany as a compensation for the damage it has suffered.

It cannot be considered that this contract was one personal to Gowe, or that it required his personal skill, and none other to complete it. It was made expressly running to himself, *his heirs, successors,* and *assigns.* At the time of the trial, respondent could not have seriously considered that the intention was to secure the individual services and particular skill of Gowe, otherwise, it is to be presumed that evidence would

have been introduced to show the need of a particular skill for that piece of work over, above, and beyond that required in the very ordinary construction of railways. No such showing having been made, we cannot conceive that the court should take it upon itself to supply that deficiency.

Considerable space has been devoted by counsel for both appellant and respondent in an attempt to make an exact and uncompromising definition of a street railway or street railroad and a railroad, and to draw a dividing line so sharply that further construction of the term will never again be necessary. Counsel have cited cases—each to sustain his own view. The courts have not been able to adopt a fixed rule of construction, and each case has, therefore, been decided upon its own particular set of facts and circumstances. We must do so in this case.

Counsel have cited the case of *Railroad Commrs.* v. *Market St. Ry. Co.*, 132 Cal. 677, [64 Pac. 1065], wherein the carrier was determined to be a street railway and outside the province of the railroad commissioners, and, as a matter of fact, under its charter carrying only. passengers. Who will have the temerity to say that when it carried the United States mail, it ceased to be a street railway and became a railroad? Assuredly, not this court.

In that case, the question as to whether or not it could have been licensed to carry freight was not in issue. The fact was stated that it carried passengers only—and we may presume it was limited by the terms of its franchise to that alone. But in no sense can it be deemed to be a case in point except that one part of its reasoning is significant: "That the entire people of the state were interested in the great corporations engaged in the carrying of freight and passengers from one portion of the state to another, or from sister states into or through the state"; but that the entire people of the state were not "interested in the rates for carrying passengers within the corporate limits of a town or municipality." And the court said: "It was the policy of the constitution that such matters as concerned the inhabitants of a particular subdivision of the state or county should be governed, as far as practicable, by local laws"—not inconsistent with the state laws, of course. This same reasoning would lead us to the conclusion that if the city of Albany wished to have a railway within its confines which should carry passengers, freight, ex-

press and mail, that so long as it did not contravene any statute of the state, it might with propriety do so.

It remains, therefore, only to be seen whether there is anything in our statutes which expressly prohibits such a railway service.

We find that title III, part IV, division first, of the Civil Code, is directed to the subject of railroads, and that section 465 thereof, in enumerating the powers of a railroad corporation, says: "8. To carry persons and property on their railroad, and to receive tolls or compensation therefor."

Title IV, Id., is devoted to street railroad corporations and recognizes the rights of municipalities in which they are located to special recognition when their streets and highways are to be used, and provides that they must grant the franchise therefor, and, in section 497, says that they "shall have power to impose such terms, restrictions, and limitations as to the use of streets and the construction and mode of operating such electric and other roads as may, by such board or body, be deemed for the public safety or welfare," and provides further, in section 510, that "street railroads are governed by the provisions of title three of this part, so far as they are applicable, unless such railroads are therein specially excepted."

There is nowhere to be found in said title III any exception of street railroads in the matter of carrying freight in the general power given in subdivision 8 of section 465 of the Civil Code. And that the provisions for the carrying of freight by railroads in general are easily applicable to the conditions of street railways is seen very clearly to-day in the numerous instances where such freight is actually being carried in conjunction with passengers on such street railways.

The legislature which enacted the Broughton Act is presumed to have had in mind the trend of the decisions of the courts as to the scope of the service to be rendered by street railways to municipalities and to have contemplated their continuance and extension.

As early as 1894 the supreme court of this state, in refusing to grant damages to an abutting owner on the theory of additional servitude being placed upon the street by the operation of a railroad under a grant by the council, quoted with approval the following language: "It has the power to authorize

their appropriation to all such uses as are conducive to the public good, and do not interfere with their complete and unrestricted use as highways. . . . ''

The court further said: ''We are at a loss . . . to see why the transportation of freight by modern and improved methods is not equally entitled to encouragement with the transportation of passengers. The essential wants of the citizen demand the former equally with the latter. . . . Yet we are told in effect that, so far as modern methods are concerned, so far as ease, speed, and economy are involved, improvements are to be limited to the transportation of passengers; that cars with wheels adjusted to move upon fixed tracks, when applied to the transportation of passengers, are within the contemplated objects in view in opening the road or street, and, therefore, add nothing material to the burden of the servitude of the abutting land owner, while a precisely similar structure adapted to the transportation of freight adds an additional burden of a different character to the servitude, and cannot be tolerated without compensation to the abutting owner. . . . We fail to appreciate the philosophy of the distinction. On the contrary, we affirm that when a public street in a city is dedicated to the general use of the public, it involves its use subject to municipal control and limitations for all the uses and purposes of the public as a street, including such methods for the transportation of passengers and freight as modern science and improvements may have rendered necessary, and that the application of these methods, and, indeed, of those yet to be discovered, must have been contemplated when the street was opened and the right of way obtained. . . . The thirteenth subdivision of section 862 of the municipal government act of this state authorizes the boards of trustees of municipalities of the sixth class . . . [of which the city of Albany is one], 'to permit, under such restrictions as they may deem proper, the laying of railroad tracks and the running of cars drawn by horses, steam, or other power thereon . . . in the public streets.' The world moves. Legislation in recent times has kept pace with the progress of the age.''

And this case further declared that the trend of judicial opinion is that the streets should be subject to all the varied wants of the public. (*Montgomery* v. *Santa Ana & West-*

*minster Ry. Co.,* 104 Cal. 186, [43 Am. St. Rep. 89, 25
L. R. A. 654, 37 Pac. 786].)

Lewis on Eminent Domain, third edition, page 286, cites
with approval the text of the opinion in *Kinsey* v. *Union
Traction Co.,* 169 Ind. 563, [81 N. E. 922], and refers to the
Montgomery case above quoted.

In the Indiana case the court said (169 Ind. 612, [81 N. E.
940]) : ''Undoubtedly the chief business of a street-car is the
carrying of passengers, but there appears in the law of the
highway no objection to its carrying light and package
freight. It has, perhaps, always been the custom in Indian-
apolis to carry, for its passengers, hand baggage, filled and
unfilled market-baskets, tool-boxes, baby-carriages, clothes-
baskets, and all manner of small articles and packages that
may be conveniently handled from the platform; also, to
carry, without an accompanying passenger, the United States
mail from the central office to the various substations of the
city; likewise, a large number of packages of newspapers from
downtown offices, and depots receiving consignments from St.
Louis, Cincinnati, and Chicago, to the hundreds of distribut-
ing points throughout the city. Repair and construction
materials, and, perhaps, some private freight, are hauled
through the city in the local company's cars, and no complaint
is heard, nor inconvenience manifested. Besides, what gen-
eral principle can be advanced in condemnation of the in-
closed, reasonably sized, neatly constructed freight or express
car? Was not the transportation of property over the roads
and streets as deeply seated in the dedicatory purpose as the
passage of persons? Plainly, the reasons that justify the one
support the other. The heavy drays and wagons employed in
handling the commerce of the city are a greater obstruction to
the street, and menace to the safety of those using it, than the
number of pedestrians. Therefore, a suitable car, com-
paratively noiseless, confined to a fixed track four or five feet
wide, in the center of the street, to which track vehicles may
be safely adjusted by keeping to the right, and which car will
carry twenty-fold more freight or express than a wagon oc-
cupying the same amount of space in the street, and meander-
ing in an irregular track, cannot, for any sufficient reason, be
declared a nuisance, or an improper use of the street. No use
should be held improper that produces no extra hazard, and

makes the way easier, safer and more convenient as a passage-way for the public in common.''

If the reasoning in these cases be correct and there is no servitude on the street superimposed because of such use of the street, the only possible objection to such use could be overcome by the police regulations which remained unalienated by the franchise.

As we view the case, the question whether the railway might or might not carry freight, express and mail, in conjunction with its passenger service, could only be raised by a citizen or resident or property owner of the city of Albany; and as to whether or not after this lapse of time, lack of objection and opposition to the grant of the franchise, such an objector could have been heard is not pertinent for us to decide at this time, as no such objector is before this court.

If it were possible for the state to maintain an action through the attorney-general, would it not be limited to an action to subjugate the road to the jurisdiction of the state and its railroad commissioners? It surely could not be for the abrogation of the franchise granted by the city of Albany, from which city, even in the event of an adverse decision by the court in such a supposititious case, Gowe or his successors would have to obtain the franchise for the use of its streets. For the grant having already been made, it could not be repudiated by the city and Gowe's property confiscated. In what other material way than the fixing of rates for the service, other than the passenger service, would a railway wholly within the confines of a city be affected if it were under the jurisdiction of the railroad commission?

The contract for the service to be rendered by the road is a severable one, because it is certainly possible to operate for passenger service alone. Inasmuch as we are of the opinion that the grant of the franchise for the carrying of passengers, as well as commodities, was within the power of the city, it is not necessary to consider the questions of the severability of the contract, except to remark that the franchise by its wording has made clear that parts of it are to be considered separately and as a condition subsequent, to wit, the rate of fare in the event of a remote contingency of the same ownership of an extended line; the furnishing of certain electric light whenever, if ever, required by the city; the height of poles

and the stringing of wires, if wires and poles are used in connection with the service.

We do not follow counsel's reasoning that the regulation of the height and the placing of poles and wires, or the fixing of fares, if attempted to be enforced, would create a condition where one class of bidder would be favored over another. The requirement of a certain candle-power to be furnished is a proper and usual requirement and is intended to be and is only a fixing of the maximum amount of light which a contractor will be required to furnish. That candle-power and that lighting could be furnished by any person, whether he intended to run a horse-car or one propelled by liquified air, or by any motive power hereafter to be invented. It is immaterial to the city as to how it is produced, but it does not leave the city in a position to arbitrarily demand either an amount of light or a kind of current which would place an untoward burden upon the bidder.

Those minor provisions were evidently deemed to be for the safety and welfare of the public and, as such, were within the power of the city to exact.

For the reasons above stated, the judgment should be reversed, and it is so ordered.

Sturtevant, J., *pro tem.*, and Beasly, J., *pro tem.*, concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on December 16, 1918.